# IN THE SUPREME COURT OF CALIFORNIA

In re B.M., a Person Coming Under the Juvenile Court Law.

---

THE PEOPLE,
Plaintiff and Respondent,
v.
B.M.,
Defendant and Appellant.

S242153

Second Appellate District, Division Six
B277076

Ventura County Superior Court
2016025026

---

December 27, 2018

Justice Liu authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger and Renner* concurred.
Justice Chin filed a concurring opinion in which Justice Corrigan concurred.

---

* Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

IN RE B.M.

S242153

Opinion of the Court by Liu, J.

Penal Code section 245, subdivision (a)(1) (hereafter section 245(a)(1)) prohibits "assault[ing] . . . the person of another with a deadly weapon or instrument other than a firearm." In this case, the juvenile court found that defendant B.M.'s use of a knife with a dull tip and slightly serrated edge, which the court referred to as a "butter knife," violated section 245(a)(1). On appeal, B.M. argued that insufficient evidence supported the juvenile court's finding because she had not used the butter knife in a manner that was " 'capable of producing and likely to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 (*Aguilar*).) In rejecting B.M.'s claim, the Court of Appeal expressly disagreed with *In re Brandon T.* (2011) 191 Cal.App.4th 1491 (*Brandon T.*), which held that a butter knife had not been used as a deadly weapon in part because the knife had broken during the alleged assault and failed to cause significant bodily injury prior to breaking. (*Id.* at pp. 1497–1498.)

We hold, consistent with settled principles, that for an object to qualify as a deadly weapon based on how it was used, the defendant must have used the object in a manner not only capable of producing but also *likely to produce* death or great bodily injury. The extent of any damage done to the object and the extent of any bodily injuries caused by the object are appropriate considerations in the fact-specific inquiry required by Penal Code section 245(a)(1). But speculation without record

support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not appropriate. We conclude that the evidence here was insufficient to sustain a finding that the knife at issue was used as a deadly weapon, and we accordingly reverse the Court of Appeal's judgment.

## I.

On the morning of July 2, 2016, seventeen-year-old defendant B.M. returned to her family's home after spending the night away. She was unable to unlock the front door with her key, so she began knocking on the door. When she received no response, she entered the house through a window.

Upon entering the home, B.M. went to the bedroom of Sophia, one of her sisters, and asked her why she had changed the locks. B.M. later acknowledged she was "mad" and "upset" when she confronted Sophia. B.M. yelled and threw a phone at Sophia and then went downstairs to the kitchen, where she grabbed a metal knife from the counter. B.M. testified she grabbed the knife because "it was just the heat of the moment, and [the knife was] just the first thing that caught [her] eye." The knife was about six inches long, with a three-inch blade that was not "sharp" and had "small ridges" on one side. Both B.M. and Sophia described the knife as a "butter knife."

B.M. returned to Sophia's bedroom with the knife. Sophia was clothed only in a towel because she had just gotten out of the shower when B.M. had arrived home. Sophia testified that when she saw B.M. with the knife, she covered herself with the blanket that was on the bed because she "didn't know what [B.M.] was going to do." She also testified that she "was pretty scared" because she thought B.M. "could really . . . hurt [her]."

On the witness stand, B.M. was asked, "So did you use a motion like to stab her?" B.M. responded, "No, but as soon as I got close to her with the knife, she covered herself with the blanket."

B.M. approached Sophia, who was lying on top of the bed with her knees bent. Sophia testified that B.M. "came . . . at [her] trying to stab [her]" and that from a distance of about three feet, B.M. made several "downward" "slicing" motions with the knife in the area around Sophia's legs. Sophia further testified that the knife hit her blanketed legs "a few" times and that the amount of pressure B.M. used was "maybe like a five or a six" on a scale from one to ten "if one is the least amount of pressure and ten is the most pressure." Sophia initially said B.M. poked her with the knife, but she later clarified that B.M. did not poke or stab her and that B.M. did not "hurt" her. B.M. testified she only "wanted to scare [Sophia]" and "had no intentions in actually stabbing [Sophia] with [the knife]."

B.M. then began arguing with her stepsister, who was also in the room. The argument eventually turned physical, and the fight moved from the bedroom to the downstairs of the house before spilling outside. During this altercation, Sophia called the police, who showed up and arrested B.M. A police officer later testified that B.M. told him "she [had] wanted to scare Sophia and admitted to making several [downward] stabbing motions at the bedding . . . that Sophia had pulled up over her and the bed." A juvenile wardship petition was filed pursuant to Welfare and Institutions Code section 602, alleging that B.M.'s use of the butter knife against Sophia was an assault with a deadly weapon under Penal Code section 245(a)(1). (All undesignated statutory references are to the Penal Code.) The juvenile court sustained the petition. In concluding that B.M. had violated section 245(a)(1), the court noted that Sophia had

testified that she "did feel the [downward] slicing motion on her legs" applied with a pressure of "a five or a six out of ten." The court also observed that even though the case involved " 'just a butter knife,' . . . the circumstances of what happened here . . . make it a felony."

B.M. appealed the juvenile court's order. As relevant here, the Court of Appeal rejected B.M.'s challenge to the sufficiency of the evidence supporting her adjudication under section 245(a)(1). The court reasoned that "[i]t matters not that [Sophia] was able to fend off great bodily injury with her blanket" or "that [B.M.] was not adept at using a knife" because B.M. "could have easily inflicted great bodily injury with this metal butter knife and just as easily [could] have committed mayhem upon the victim's face." The court concluded that the juvenile court's findings — "that the six-inch metal butter knife could be used to slice or stab, even though it was not designed for such," and that the knife was in fact "used in a manner 'capable' of producing great bodily injury" — were "not 'wholly irreconcilable' with the evidence."

The court also said *Brandon T., supra*, 191 Cal.App.4th 1491, was " 'wrongly decided.' " In that case, a juvenile "tried to cut [the victim's] cheek and throat" with a knife that was "about three and a quarter inches long, with a rounded end and slight serrations on one side." (*Brandon T.*, at pp. 1496–1497.) While wielding the knife, the juvenile "moved his arm up and down, applying a slashing motion" that resulted in " 'welts' " and " 'a small scratch' " but did not draw blood. (*Id.* at p. 1497.) "The pressure that Brandon applied was not enough to cause death or great bodily injury to [the victim]. Yet it was too much pressure for the knife to bear, and the handle broke off." (*Ibid.*) The court in *Brandon T.* reversed the juvenile's adjudication

under section 245(a)(1), reasoning that "[t]he butter knife . . . had a rounded end, not a pointed one. Brandon applied force, but the knife did not penetrate through the layers of [the victim's] skin; sufficient force was used, however, to cause the butter knife to break during use. Although [the victim] perceived that Brandon was trying repeatedly to cut him, the knife failed and was not capable of use as obviously intended." (*Brandon T.*, at pp. 1497–1498.) The Court of Appeal here said that *Brandon T.* "gives undue emphasis to the lack of injuries" and that the fact that the knife "broke during the assault preventing further stabbing should not inure to the defendant's benefit."

We granted review.

## II.

"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028–1029.) Although "[s]ome few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law" (*id.* at p. 1029), we have said a knife is not such an object (*People v. McCoy* (1944) 25 Cal.2d 177, 188), and the Attorney General does not argue to the contrary here. "In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar*, at p. 1029.) Our inquiry is limited to whether substantial evidence supports the juvenile

court's finding that B.M. used the butter knife as a deadly weapon. (*In re Manuel G.* (1997) 16 Cal.4th 805, 822–825.)

**A.**

At the outset, we clarify several principles that guide our analysis. First, the object alleged to be a deadly weapon must be used in a manner that is not only "capable of producing" but also " '*likely to produce* death or great bodily injury.' " (*Aguilar*, *supra*, 16 Cal.4th at p. 1029, italics added.) Although the Court of Appeal in this case recited the *Aguilar* standard, its analysis addressed only whether B.M.'s manner of using the butter knife was capable of causing great bodily injury, not whether it was likely to do so. And the court misstated the standard by omitting the "likely" requirement when it said "an assault with a deadly weapon is complete when the defendant, with the requisite intent, uses an object in a manner which is capable of producing great bodily injury upon the victim."

The Attorney General argues that "capable of producing" and "likely to produce" are essentially the same because the term " 'likel[y]' " has the same meaning as " 'possib[le].' " But this construction is at odds with the ordinary meaning of "likely." (See Merriam-Webster Collegiate Dict. (11th ed. 2014) p. 721 [defining "likely" as "having a high probability of occurring or being true" and "very probable"]; Black's Law Dict. (10th ed. 2014) p. 1069 [defining "likely" as "probable"].) It is also inconsistent with how we have treated the term "likely to produce great bodily harm or death" elsewhere in the Penal Code. (See *People v. Valdez* (2002) 27 Cal.4th 778, 784 [the term " 'likely to produce great bodily harm or death,' " as used in the felony child abuse statute, § 273a, refers to situations in which

" ' "the probability of serious injury is great" ' "]; *People v. Sargent* (1999) 19 Cal.4th 1206, 1223 [same].)

Our case law on the crime of assault is also instructive. Assault is a general intent crime; it does not require a specific intent to cause injury. (See *People v. Williams* (2001) 26 Cal.4th 779, 782; *People v. Rocha* (1971) 3 Cal.3d 893, 898–899.) The requisite mental state is "actual knowledge of the facts sufficient to establish that the defendant's act by its nature will probably and directly result in injury to another." (*Williams* at p. 782; accord, *Rocha*, at p. 899.)

The Attorney General further contends that the Court of Appeal sufficiently addressed the "likely" standard by noting that " '[t]he use of an object in an assault increases the likelihood of great bodily injury.' " But the fact that B.M.'s use of the butter knife may have *increased the likelihood* of serious injury does not establish that her use of the object was *likely* to cause serious injury. An increase in likelihood from impossible to unlikely, for example, does not show that the object was likely to cause serious harm. The use of an object in a manner "likely to produce" death or great bodily injury (*Aguilar*, *supra*, 16 Cal.4th at p. 1029) requires more than a mere possibility that serious injury could have resulted from the way the object was used.

Second, the *Aguilar* standard does not permit conjecture as to how the object could have been used. Rather, the determination of whether an object is a deadly weapon under section 245(a)(1) must rest on evidence of how the defendant actually "used" the object. (*Aguilar*, *supra*, 16 Cal.4th at p. 1029; see *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1087 (*Beasley*) [finding it "certainly conceivable" that a broomstick "might be wielded in a manner capable of producing, and likely

to produce, great bodily injury," but declining to make such a finding because the record did not indicate "the degree of force Beasley used in hitting [the victim] with the stick"].)

*People v. Duke* (1985) 174 Cal.App.3d 296 (*Duke*) is instructive. The defendant "use[d] . . . a headlock to hold his victim while he touched her breast." (*Id.* at p. 302.) The victim said "[t]he headlock made her feel 'choked' but did not cut off her breathing." (*Ibid.*) Although "[s]he felt that his hold on her was 'firm,' [she] did not say that he tightened his grip." (*Ibid.*) The court found insufficient evidence to sustain a conviction for assault with force likely to cause great bodily injury, emphasizing that the inquiry focuses on "the force *actually used,*" not "the force that . . . *could* have [been] used." (*Id.* at p. 303.) "[T]he fact that appellant could have easily broken [the victim's] neck or could have choked her to the point of cutting off her breathing by exerting greater pressure on her neck or windpipe will not support the conviction of felony assault. This would involve gross speculation on the part of the jury as to what the appellant would have done if he had not stopped of his own accord or had been stopped by outside forces." (*Ibid.*)

*Duke* involved assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)) rather than assault with a deadly weapon. But we noted in *Aguilar* that "except in those cases involving an inherently dangerous weapon[,] the jury's decisionmaking process in an aggravated assault case . . . is functionally identical regardless of whether . . . the defendant employed a weapon alleged to be deadly as used or employed force likely to produce great bodily injury; in either instance, the decision turns on the nature of the force used." (*Aguilar, supra,* 16 Cal.4th at p. 1035; see *ibid.* [" '[A]ll aggravated assaults are

ultimately determined based on the force likely to be applied against a person.' "].) *Duke*'s reasoning is thus applicable here.

Although it is inappropriate to consider how the object could have been used as opposed to how it was actually used, it is appropriate in the deadly weapon inquiry to consider what harm could have resulted from the way the object was actually used. Analysis of whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. As noted, a mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass.

Here, the Court of Appeal said B.M. could "easily have committed mayhem upon the victim's face." But the evidence showed that B.M. used the butter knife only in the area of Sophia's legs, which were covered with a blanket. There is no evidence that B.M. stabbed, sliced, or pointed the butter knife toward or near Sophia's face, or that B.M. attempted or threatened to do so. Nor is there evidence that B.M. was flailing her hand with the butter knife or otherwise wielding it wildly or uncontrollably. (Cf. *People v. Simons* (1996) 42 Cal.App.4th 1100, 1106 (*Simons*).) The Court of Appeal's remark about injury to the victim's face is an impermissible conjecture as to how B.M. could have used the butter knife. It is not a reasonable inference of potential injury based on evidence of how B.M. actually used the butter knife.

Third, although it is appropriate to consider the injury that could have resulted from the way the object was used, the extent of actual injury or lack of injury is also relevant. "[A] conviction for assault with a deadly weapon does not require

proof of an injury or even physical contact" (*Brandon T.*, *supra*, 191 Cal.App.4th at p. 1497), but limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm. In *Beasley*, the court explained that "bruises on [the victim's] shoulders and arms are insufficient to show that Beasley used the broomstick as a deadly weapon." (*Beasley*, *supra*, 105 Cal.App.4th at p. 1088.) And in *Brandon T.*, the court found insufficient evidence that a butter knife was used as a deadly weapon where "the knife would not cut" and instead "resulted in a small scratch on [the victim's] cheek." (*Brandon T.*, at p. 1497.) The fact that applying only enough pressure to inflict a small scratch caused the knife to break indicated that the object, by its nature, was neither capable of producing nor likely to produce serious injury. (*Ibid.*) Contrary to what the Court of Appeal here said, *Brandon T.* properly considered the knife's inability to cause more than a small scratch in evaluating whether the deadly weapon finding was supported by substantial evidence. (See *In re D.T.* (2015) 237 Cal.App.4th, 693, 701 (*D.T.*) ["the knife [in *Brandon T.*] could not have produced a stabbing injury because it broke when the minor pressed it against the victim"].)

## B.

With these principles in mind, we turn to the case before us. Viewing the facts in the light most favorable to the judgment, we conclude that the juvenile court's finding that B.M. used the butter knife as a deadly weapon is not supported by substantial evidence, i.e., " 'evidence which is reasonable, credible, and of solid value.' " (*In re I.C.* (2018) 4 Cal.5th 869, 892.) Under any plausible interpretation of the term "likely," the evidence was insufficient to establish that B.M.'s use of a

butter knife against her sister's blanketed legs was " 'likely to produce death or great bodily injury.' " (*Aguilar, supra,* 16 Cal.4th at p. 1029.)

Several circumstances support this conclusion. First, the record indicates that the six-inch metal knife B.M. used was "[t]he type of knife that you would use to butter a piece of toast"; it was not sharp and had slight ridges on one edge of the blade. (See *Brandon T., supra,* 191 Cal.App.4th at pp. 1496–1498 [butter knife with "rounded end" was incapable of causing serious injury even when applied to the victim's face with enough force to break the knife]; *D.T., supra,* 237 Cal.App.4th at p. 701 [contrasting the butter knife in *Brandon T.* with a sharp pocketknife].)

Second, B.M. used the knife only on Sophia's legs, which were covered with a blanket. There is no evidence that B.M. used or attempted to use the knife in the area of Sophia's head, face, or neck, or on any exposed part of her body. (See *Beasley, supra,* 105 Cal.App.4th at p. 1087 [finding insufficient evidence that a broomstick was used as a deadly weapon where the defendant caused bruises on the victim's arms and shoulders but "did not strike [the] head or face"].)

Third, the moderate pressure that B.M. applied with the knife was insufficient to pierce the blanket, much less cause serious bodily injury to Sophia. (See *Brandon T., supra,* 191 Cal.App.4th at pp. 1496–1497; *People v. Brown* (2012) 210 Cal.App.4th 1, 7 ["[I]f injuries do result, the nature of such injuries and their location are relevant facts for consideration in determining whether an object was used in a manner capable of producing and likely to produce great bodily injury."].)

The Court of Appeal, while acknowledging that "[t]he extent of the injuries, or lack of them, is relevant," suggested that Sophia was not injured in part because B.M. "was not adept at using a knife." This circumstance "does not inure to [B.M.'s] benefit," the court reasoned, just as lack of injury is not probative in "the typical assault with a deadly weapon with a firearm when the defendant has poor aim." But the record contains no evidence as to how adept B.M. was in using a knife, and in any event, it does not matter what injury B.M. could have inflicted if she had used the knife in a more adept manner. (See *ante*, at pp. 8–9.) Such conjecture strays from the focus on the manner in which a defendant actually used the object, whether adept or not. Where a defendant uses a firearm with poor aim, lack of injury carries little weight not because it is appropriate to consider what injury could have resulted if the defendant had had better aim, but because in many circumstances using a firearm even with poor aim is likely to produce death or serious injury. (See, e.g., *People v. Bradford* (1976) 17 Cal.3d 8, 20 [the defendant "fired five shots at [a police officer] while [the officer] was pinned under a car"]; *People v. Peau* (2015) 236 Cal.App.4th 823, 828 [evidence could not exclude the possibility that the victim was hit by bullets ricocheting from the pavement]; *Gilmore v. Superior Court* (1991) 230 Cal.App.3d 416, 419 [victim was killed "when the bullet ricocheted off the asphalt surface"].)

The Attorney General reprises the Court of Appeal's reasoning that Sophia could have been seriously injured had she not defended herself with the blanket. But there is no evidence indicating that Sophia pulled the blanket over her legs after or in reaction to seeing B.M. begin a slicing or stabbing motion directed at Sophia's exposed legs. Sophia testified that B.M.

"came . . . at [her] trying to stab [her]" only "after [she] covered [herself]." Further, as noted, nothing in the record suggests that B.M., who was aware that Sophia's legs were covered and that the knife was not penetrating the blanket, then used or tried to use the knife on an exposed part of Sophia's body. To be sure, an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway. But the facts known to the aggressor before the assault, including defensive measures taken by the victim, are relevant to determining whether the aggressor used an object in a manner likely to cause serious injury.

The juvenile court said it was "lucky" there were no injuries. Even so, there is no evidence that B.M. attacked any other part of Sophia's body despite the opportunity to do so. Nor is there any evidence that B.M. initially tried to stab some other part of Sophia's body but missed and instead hit Sophia's blanket-covered legs. It may be that B.M. could have caused serious injury if she had applied greater force, if she had applied the same force to Sophia's exposed legs, if she had used the knife on Sophia's head, face, or neck, or if she had wielded the knife in an uncontrolled or unpredictable manner. But the inquiry must focus on the evidence of how B.M. actually used the knife, not on various conjectures as to how she could have used it.

The Attorney General also echoes the Court of Appeal's reasoning that B.M. was willing to go to great lengths to injure Sophia because B.M. grabbed the knife only after she was unable to harm Sophia by "hurling" a phone at her and pulling her hair. But the record contains no facts regarding the phone itself or the manner in which B.M. threw the phone, and there is no allegation that B.M. used the phone in a manner likely to

cause serious injury. Moreover, contrary to the timeline suggested by the Court of Appeal, the record indicates that B.M. pulled Sophia's hair during Sophia's phone call to 911, which occurred *after* B.M. used the knife against her. The inference that B.M. was intent on seriously injuring Sophia is belied by the absence of any evidence that B.M. attempted to use the knife again after using it on Sophia's blanket-covered legs. It is true that Sophia said she was "scared" that B.M. "could really hurt [her]" when B.M. showed up in her room with the knife. But Sophia's perception, considered with the totality of the evidence as to how B.M. actually used the knife, does not amount to reasonable evidence of solid value that B.M. used the knife in a manner likely to produce great bodily injury.

The Attorney General further notes that "an object can be a deadly weapon even if there is no contact or injury, and ' "even if it's not actually used with deadly force." ' " But the cases he relies on involved a sharp object applied to a vulnerable part of the body (*D.T.*, *supra*, 237 Cal.App.4th at pp. 697, 696 [" 'sharp' and 'pointy' " pocketknife used to "poke[]" someone "multiple times in the upper back" is a deadly weapon]; see *id.* at pp. 699–701; *People v. Page* (2004) 123 Cal.App.4th 1466, 1469 [" 'sharp[,] pointy' " pencil held up to someone's neck]) or a sharp object wielded in a wild or uncontrolled manner (*Simons*, *supra*, 42 Cal.App.4th at p. 1106 [the defendant, being chased by police officers, " 'flail[ed] his hands . . . [and] would bring [a] screwdriver forward' " when approached]). Here, the knife was not sharp or pointy; it was not applied to any vulnerable part of Sophia's body; and there is no evidence that B.M. wielded the knife wildly or uncontrollably.

Viewing the totality of the evidence in the light most favorable to the judgment, we find it questionable whether a

trier of fact could reasonably conclude that the manner in which B.M. used the knife was capable of causing great bodily injury. But even if B.M.'s use of the knife were capable of causing great bodily injury, there is no substantial evidence that it was likely to do so.

## CONCLUSION

The judgment of the Court of Appeal is reversed.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**RENNER, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Concurring Opinion by Justice Chin

I concur in the majority opinion, which I have signed. I do so with the understanding that we are not deciding the meaning of the word "likely" in the phrase " 'capable of producing and *likely* to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029, italics added (*Aguilar*).) The latter phrase was adopted by this court to define what constitutes a "deadly weapon" for purposes of Penal Code section 245, subdivision (a)(1). As I read the majority opinion, we reach no conclusion about the meaning of the word "likely" in the *Aguilar* standard, other than to say that it means something "more than a mere possibility." (Maj. opn., *ante*, at p. 7; see *id.* at p. 9.)

The majority opinion cites several definitions of the word "likely" according to which the word means " 'having a high probability,' " " 'very probable,' " or a " 'probability [that is] great.' " (Maj. opn., *ante*, at pp. 6–7.) The opinion cites those definitions as examples that disprove the Attorney General's assertion that "likely" means "possible." (*Id.* at p. 6.) The majority opinion should not be read as holding, based on those examples, that for purposes of *Aguilar*'s definition of what constitutes a deadly weapon, "likely" means "probable." Indeed, such a holding would be inconsistent with the majority's citations to *In re D.T.* (2015) 237 Cal.App.4th 693, *People v. Page* (2004) 123 Cal.App.4th 1466, and *People v. Simons* (1996) 42 Cal.App.4th 1100. (See maj. opn., *ante*, at p. 14.) Those cases

all involved the use of a sharp object in a threatening manner, and in all three cases an argument could be made that great bodily injury was not *probable*, but the deadly weapon finding was nonetheless upheld. (See also *In re Jose R.* (1982) 137 Cal.App.3d 269 [upholding a conclusion that a pin inserted in an apple was a deadly weapon, despite the fact that great bodily injury was arguably not probable].)

In this case, we do not decide the question of what "likely" means in the context of the *Aguilar* standard, and I do not wish to prejudge that question, but our resolution of the question calls for a careful analysis like the one that appears in *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, a decision involving the meaning of the word "likely" in the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.), which refers to persons "likely to engage in acts of sexual violence" (*id*., § 6601, subd. (d)). That opinion shows that, in the context of a law designed to prevent a harm, "likely" can sometimes mean something less than "probable."

Turning to the facts of this case and mindful that we must construe the evidence in favor of the trial court's judgment, I agree with the majority that "[u]nder any plausible interpretation of the term 'likely,' the evidence was insufficient to establish that [defendant] B.M.'s use of a butter knife against her sister's blanketed legs was ' "likely to produce death or great bodily injury." ' (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)" (Maj. opn., *ante*, at pp. 10-11.) Significantly, the evidence at trial in this case included close questioning of the victim, Sophia M., concerning how her sister used the butter knife against her. Sophia could not recall which way her sister held the knife, and refused, even when pressed by the prosecution and the court, to testify that her sister held the knife as one would a dirk or a

dagger. Instead, Sophia described her sister making a "few" slicing motions on Sophia's blanketed legs, doing so with enough force that Sophia could feel it "a little." Using a butter knife — even one with small ridges on the blade — to make a few slicing motions across the blanket-covered legs of a healthy person is not, under any definition of the word "likely," an act that is likely to produce great bodily injury.

Based on the foregoing understanding of the majority opinion, I concur.

**CHIN, J.**

**I Concur:**

**CORRIGAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re B.M.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 10 Cal.App.5th 1292
**Rehearing Granted**

_____

**Opinion No.** S242153
**Date Filed:** December 27, 2018

_____

**Court:** Superior
**County:** Ventura
**Judge:** Brian John Back

_____

**Counsel:**

Elizabeth K. Horowitz, under appointment by the Supreme Court, and Donna Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Michael J. Wise, Michael C. Keller and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elizabeth K. Horowitz
Law Office of Elizabeth K. Horowitz
5272 South Lewis Avenue, Suite 256
Tulsa, OK  74105
(424) 543-4710

Steven E. Mercer
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6126