Filed 11/22/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY RAY DRAYTON, JR.,<br>        Defendant and Appellant. | A155725<br><br>(San Mateo County<br>Super. Ct. No. 18-SF-006551-A) |

A man grabbed his former girlfriend in a bear hug and pushed her toward the edge of a train platform as a train approached. He let her go, and she escaped uninjured. A jury convicted the man of assault with force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(4)).[1] The question we must decide is whether a serious injury was "likely" within the meaning of the statute—an issue recently addressed by our Supreme Court. (*In re B.M.* (2018) 6 Cal.5th 528 (*B.M.*).) In the published part of the discussion, section I, we conclude substantial evidence supports the jury's verdict. In the unpublished parts, sections II and III, we conclude the case must be remanded for resentencing under recently enacted legislation and for correction of two errors in the abstract of judgment.

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections II and II of the Discussion.

[1] Undesignated statutory references are to the Penal Code.

1

## BACKGROUND

### A.

Section 245, subdivision (a)(4) prohibits an assault upon another person "by any means of force likely to produce great bodily injury." "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.) "Likely" has not been defined precisely, as discussed below.

### B.

One morning at a Caltrain station, M.G. and her son were standing on the southbound side of the train platform. The platform is approximately 70 yards long and is elevated 2 to 3 feet above the train tracks. A one-foot-wide textured yellow line runs along the edge of the platform. Six to eight inches behind that line is a thinner yellow line. Warning signs instruct passengers to stand behind that line. Crossing the line is unsafe when trains are moving past the platform.

The defendant, Anthony Ray Drayton Jr., saw M.G. They had formerly dated. M.G. looked at Drayton behind her but turned around without speaking to him.

Drayton approached M.G. from behind and grabbed her entire body "like a bear hug." According to M.G., the train was approaching the platform when Drayton grabbed her. She tried to tussle her way out of Drayton's arms, but he grasped her more forcefully and kept leaning her forward toward the tracks. M.G. testified Drayton had lifted her off the ground and "over the train tracks," where she could see the front of the approaching train as it entered the platform area. Drayton told her son, "do you want to see your mom die[?]" M.G. screamed for help, and Drayton let her go. At that point, the train was passing in front of them.

M.G. believed the physical struggle lasted about one minute, though at other times she testified it lasted between two to three minutes. She admitted that she was not good at estimates.

2

Andrew Balderchak, also standing on the southbound platform, heard a scream. He turned and saw a man standing behind a woman with his hands around her waist. Balderchak testified it looked like "a legitimate struggle" as the woman tried to free herself. The couple were on the yellow side of boundary line, "where you're not supposed to be standing . . . when the train is coming in." Balderchak could not be sure if the woman's feet left the ground; he did not see the man "dangling her over the train tracks." After the woman screamed, the man backed away from her, and the woman grabbed her son and walked in the opposite direction, cursing at the man. He recalled the train arrived two to four minutes later.

Ara Bicakci saw a man pushing a woman towards the tracks as the woman tried to move away. Bicakci initially believed it was horseplay. The couple were 40 to 50 yards away from Bicakci on the platform. Bicakci initially did not see a train approaching. Bicakci stopped watching them until he heard the woman raise her voice. When Bicakci turned toward them again, they had separated. Bicakci saw the man try to approach the woman, who rapidly moved away from him and was saying something to him angrily. Bicakci realized the incident was probably not horseplay. The train was entering the platform area.

Advait Karande was also standing on the southbound platform when he heard a loud scream. He turned and saw a man holding a woman from behind and "dragging" her toward the train tracks. Karande testified the woman seemed scared. He also observed the man and woman were "pretty close to the train tracks," either along or across the yellow boundary line, looking at the approaching train. At the beginning of the incident, the train was "very close to the platform or entering the platform." After seeing the man and woman struggling and looking at the train, Karande turned to look at the train as well, and when he turned back, they had separated. Passengers were boarding the train. "All the things were happening at the same time."

Drayton flatly denied touching or being violent or aggressive towards M.G. at the train station.

## C.

A jury convicted Drayton of assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4).) The trial court sentenced Drayton to a term of five years, consisting of the low term of two years, doubled due to a prior strike (§ 1170.12, subd. (c)(1)), and an additional one-year enhancement (§ 667.5, subd. (b).)

The court ordered Drayton to pay various fines and assessments: a victim restitution fine (§ 1202.4, subd. (a)); a $300 restitution fine (§ 1202.4, subd. (b)); a collection fee amounting to 10 percent of the restitution fine (§ 1202.4, subd. (l)); a $300 parole revocation restitution fine, which the court stayed (§ 1202.45, subd. (a)); $40 in court security fees (§ 1465.8, subd. (a)(1)); and $30 in court assessments (Gov. Code, § 70373, subd. (a)(1).)

## DISCUSSION

## I.

Drayton argues the evidence was insufficient to support the jury's finding that the force he used was likely to cause great bodily injury. Applying the substantial evidence standard (*B.M.*, *supra*, 6 Cal.4th at p. 536), we conclude the evidence was sufficient.

## A.

At the outset, we reject Drayton's theory that, because the only force he personally used was a bear hug, the oncoming train is irrelevant. In *People v. Russell* (2005) 129 Cal.App.4th 776 (*Russell*), the court upheld a conviction for assault with force likely to produce great bodily injury when the defendant pushed the victim into a street, where the victim was hit by a car. In finding substantial evidence supported the conviction, the court reasoned that "it is not necessarily the force of appellant's push, so long as it was sufficient to propel [the victim] into the street when the [driver's] car was approaching. It is the injury-producing potential of the moving automobile that supplies the likelihood of great bodily injury or worse." (*Id*. at p. 788.) The same reasoning applies to a defendant who pushes a person into the path of an approaching train. (See also *People v. Conley* (1952) 110 Cal.App.2d 731, 732-733, 737 [defendant pushed the victim out of a bar and onto the sidewalk, where the victim hit his head on a parking meter].)

4

*Russell* provides a good segue to the key issue in this case. Drayton did not go as far as the defendant in *Russell*. He released M.G. before she could be struck by the train. A person can be guilty of an aggravated assault despite causing no injury so long as his actions made a serious injury *likely*. (§ 245, subd. (a)(4); see *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) In *Russell*, the court held "[p]ushing a person into the path of an oncoming automobile is 'likely' to cause serious injury, whether this particular victim suffered serious injury or not." (*Russell*, *supra*, 129 Cal.App.4th at p. 788.) We thus turn to the question of whether substantial evidence supports the jury's finding that Drayton's actions were *likely* to cause great bodily injury.

In answering this question, we cannot consider what may have happened if Drayton had not released M.G. In *People v. Duke* (1985) 174 Cal.App.3d 296 (*Duke*), the defendant was convicted of using force likely to cause great bodily harm when he put the victim in a headlock while he grabbed her breast. The court of appeal reversed. Because the defendant only held her momentarily and released her almost immediately, she "was in no danger from the force actually exerted on her body." (*Id.* at p. 304.) The possibility that the defendant "could have easily broken [the victim's] neck or could have choked her to the point of cutting off her breathing by exerting greater pressure on her neck or windpipe . . . would involve gross speculation on the part of the jury as to what the appellant would have done if he had not stopped." (*Id.* at p. 303.)

Our Supreme Court endorsed *Duke*'s analysis in *B.M.*, *supra*, 6 Cal.5th 528, 534-535. In *B.M.*, a minor tried to scare her sister by attacking her with a butter knife, making several downward slicing motions with the knife at her sister's legs, which were covered with a blanket. The sister was scared but not injured. (*Id.* at p. 531.) The juvenile court found that the minor committed an aggravated assault under section 245, subdivision (a)(1).[2] The court of appeal affirmed, reasoning that it did not matter that the sister's legs

---

[2] Although section 245, subdivision (a)(1) (assault with a deadly weapon) is a different form of aggravated assault, the relevant analysis is the same—i.e., whether the defendant

were protected by a blanket or that the minor did not use the knife effectively.  It sufficed that the knife was capable of producing great bodily injury and the minor could easily have slashed her sister's face.  (*Id*. at pp. 531-532.)

The Supreme Court reversed.  It held that the issue is the force that the defendant actually used, not the force that she might have used.  (*B.M., supra,* 6 Cal.5th at p. 535.) It is also appropriate to consider the injuries that the defendant may have caused based on what she actually did (ineffectively slash at her sister's legs, covered with a blanket), but not the injuries she might have caused if she had done something different (slash at her sister's face).  (*Id*. at p. 535.)  Courts must assess "the potential harm in light of the evidence."  (*Ibid*.)  "[A] mere possibility of injury is not enough.  But the evidence may show that an injury was likely, even if it did not come to pass."  (*Ibid*.)

The Court stopped short of defining the word "likely."  Citing dictionary definitions such as "probable" and "very probable," the Court rejected the Attorney General's argument that "likely" merely means "possible."  (*B.M.*, *supra*, 6 Cal.5th at p. 533.)  But it ultimately held that the evidence was insufficient "under any plausible interpretation of the term 'likely.'"  (*Id*. at p. 536.)  Two justices concurred in the opinion with the understanding that the Court was not defining the word.  (*Id*. at pp. 539-540 (Chin, J. concurring).)

Applying the principles of *B.M.*, we must focus on Drayton's actions—pushing M.G. toward the edge of the platform as the train approached before letting her go—and assess the likelihood of serious harm to her. The question boils down to timing and proximity.  If the train was not close when Drayton released her, or if Drayton and M.G. were never close to the edge of the platform, the likelihood of injury was nil.  The closer they came to the moving train, the greater the likelihood that Drayton's actions would have caused a serious injury.

---

used *force likely to cause great bodily injury*.  (*B.M.*, *supra*, 6 Cal.5th at p. 535; *Aguilar*, *supra*, 16 Cal.4th at pp. 1035-1038.)

We conclude substantial evidence supports the verdict. Multiple witnesses testified that Drayton pushed M.G. into the yellow danger zone. During the struggle, Drayton lifted her off the ground and "over the train tracks," where she could see the front of the approaching train. At the beginning of the struggle, the train was entering the platform area. When Drayton let her go, the train was passing her. Setting aside conjecture about what might have happened, when we assess the "potential harm in light of the evidence" (*B.M.*, *supra*, 6 Cal.5th at p. 535), credible evidence shows Drayton placed M.G. in genuine danger of being struck by the train. (*Ibid*. ["A serious injury was likely, even if it did not come to pass"].)

Drayton argues M.G.'s testimony about the proximity of the train was not credible and conflicted with other witnesses' testimony. While it is true Balderchak and Bicakci testified that the train approached the station after Drayton released M.G., this evidence created a conflict for the jury to resolve. (See *People v. Harris* (2013) 57 Cal.4th 804, 849.) The record supports the jury's decision to credit M.G. and Karande's testimony that the train was approaching while Drayton pushed her dangerously close to the tracks.

**II.**

In a supplemental brief, Drayton contends his one-year prison term enhancement imposed pursuant to section 667.5, subdivision (b), must be stricken in light of Senate Bill No. 136 (S.B. 136), which was signed into law on October 8, 2019 and becomes effective on January 1, 2020. The People concede the issue, and we agree.

For non-violent felonies, section 667.5, subdivision (b) currently imposes an additional one-year term for each prior separate prison term or county jail felony term. However, effective January 1, 2020, amended section 667.5, subdivision (b) imposes that additional one-year term only for a prior prison term served for a sexually violent offense. (§ 667.5, subd. (b), as amended by Sen. Bill No. 136, approved by Governor, Oct. 8, 2019 (2019-2020 Reg. Sess.), p. 96.) Because Drayton's prior prison term was not for a sexually violent offense, the one-year enhancement is now unauthorized under the amended statute.

7

The parties agree (as do we) that S.B. 136 applies to Drayton because the statute is retroactive and applies to all cases not yet final as of its effective date. (See *In re Estrada* (1965) 63 Cal.2d 740, 744-745; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972-974.) Accordingly, we remand for resentencing *after* January 1, 2020 and direct the trial court to strike Drayton's one-year prior prison term enhancement. (See *Garcia*, *supra*, 28 Cal.App.5th at p. 973 [remanding case for resentencing after the effective date of newly enacted legislation given the improbability that the case would be final before that date].)

## III.

We also agree with both parties that the abstract of judgment incorrectly indicates the trial court sentenced Drayton to a term of five years and two months. The trial court imposed a sentence of five years (which includes the one-year enhancement term (§ 667.5, subd. (b)) that must be stricken in light of S.B. 136.) Therefore, we order the trial court to correct the abstract of judgment to eliminate the extra two months. (See *People v. Delgado* (2008) 43 Cal.4th 1059, 1070 [the abstract of judgment "cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict."].)

However, we disagree with Drayton that the abstract of judgment inaccurately states a restitution fine of $330. The trial court ordered Drayton to pay a $300 restitution fine, plus a collection fee of 10 percent of the $300. (§ 1202.4, subds. (b) & (l).) Section 1202.4, subdivision (l), authorizes such a collection fee.

Lastly, the abstract of judgment states the incorrect parole revocation restitution fine (§ 1202.45, subd. (a)). A parole revocation restitution fine must be the same amount as the restitution fine. (§ 1202.45, subd. (a).) Accordingly, we direct the trial court to change the $33,120 parole revocation fine to $300.

## DISPOSITION

The sentence is vacated, and the matter is remanded to the trial court to strike the one-year prior prison term enhancement (§ 667.5, subd. (b)) and resentence Drayton after January 1, 2020. The trial court is directed to correct the abstract of judgment as follows: (1) modify the sentence from five years and two months to four years (including the stricken one-year enhancement); and (2) modify the parole revocation restitution fine

8

from $33,120 to $300.  As modified, the judgment is affirmed.  The court shall transmit a corrected copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

                                                   _____

                                                   BURNS, J.

WE CONCUR:


_____

JONES, P. J.


_____

SIMONS, J.

A155725

Superior Court of San Mateo County, No. 18-SF-006551-A, Hon. Richard A. DuBois

Audrey R. Chavez, By Appointment of the First District Court of Appeal under the First District Appellate Project, for Defendant and Appellant

Xavier Becerra, Attorney General, Gerald R. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K. Schalit, Supervising Deputy Attorney General, and Arthur P. Beever, Deputy Attorney General, for Plaintiff and Respondent