Filed 3/29/23  P. v. Barrientos CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAIME EDGARDO BARRIENTOS,<br><br>    Defendant and Appellant. | H049541<br>(Santa Clara County<br> Super. Ct. No. CC268085) |

Defendant pleaded guilty to murder in 2004 and was sentenced to 25 years to life in prison.  He petitioned for resentencing under former Penal Code section 1170.95 (now Pen. Code, § 1172.6), and the trial court denied the petition after an evidentiary hearing. Defendant challenges the trial court's finding beyond a reasonable doubt that he was a major participant in a home invasion robbery who acted with reckless indifference to human life, and its alternative finding that he aided and abetted an implied malice murder.  For the reasons stated here, we will affirm the order denying defendant's resentencing petition.

## I.    TRIAL COURT PROCEEDINGS

William Giardino was shot and killed during a home invasion robbery in 2002. Defendant participated in the robbery along with Alfred Martinez and Bernard Ballard.

A 2003 information charged defendant with murder (Pen. Code, § 187), including allegations that he personally used a firearm (Pen. Code, § 12022.53, subd. (b)) and that the murder occurred during a burglary and a robbery (Pen. Code, §§ 190.2, subd. (a)(17),

460, 211). He was also charged with first degree burglary (Pen. Code, §§ 459, 460), including allegations that he personally used a firearm (Pen. Code, § 12022.53, subd. (b)) and personally used a deadly or dangerous weapon (a flashlight) (Pen. Code, § 12022, subd. (b)(1)); and first degree robbery (Pen. Code, §§ 211, 212.5), again including allegations of personal use of a firearm (Pen. Code, § 12022.53, subd. (b)) and a deadly or dangerous weapon (a flashlight) (Pen. Code, § 12022, subd. (b)(1). Unspecified statutory references are to the Penal Code.) Defendant was charged together with codefendant Bernard Ballard.

Defendant pleaded guilty in 2004 to second degree murder and first degree robbery. He admitted committing the robbery in an inhabited dwelling while acting in concert with two or more people (§ 213, subd. (a)(1)(A)), and that he personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)). He was sentenced to 25 years to life in prison, consisting of 15 years to life for second degree murder, consecutive to nine years for first degree robbery and one year for the deadly or dangerous weapon enhancement.

A. **RESENTENCING PETITION AND EVIDENTIARY HEARING**

In 2019, defendant petitioned for resentencing under former section 1170.95 (now § 1172.6), and the trial court issued an order to show cause. Defendant's petition was consolidated with a similar petition filed by coparticipant Alfred Martinez for purposes of a joint evidentiary hearing, at which the following testimonial and documentary evidence was presented.

1. **Defendant's Interrogation Statements**

A San Jose Police Department detective testified at defendant's preliminary hearing in 2003 about an interview with defendant following Giardino's homicide. (The preliminary hearing transcript was admitted as an exhibit in the § 1172.6 proceedings.) Defendant waived his *Miranda* rights and agreed to speak with the detective. Defendant told the detective he went to Giardino's apartment with Ballard and Martinez to steal

2

drugs. Ballard and Martinez had handguns, and defendant had a metal flashlight. Defendant knocked on Giardino's door when they arrived, Giardino opened the door, and the three perpetrators forced their way inside. Also in the apartment were a Hispanic male, a female, and a baby. Defendant indicated Ballard asked Giardino where money was hidden, defendant hit Giardino in the head with a flashlight, and then defendant "heard one shot go off." Ballard had been pointing a gun at Giardino. Martinez and Ballard took laundry baskets (which they thought contained hidden money), and the three perpetrators fled in defendant's car. Defendant told the detective he became aware that Martinez and Ballard had guns either just before they entered the apartment, or as they entered the apartment when the coparticipants brandished them.

### 2. Defendant's Former Girlfriend

The woman who had been defendant's girlfriend at the time of the robbery testified at the evidentiary hearing that defendant came to her house early one morning distraught. He crouched down, sat on the floor, held his knees, and rocked back and forth. He was quiet at first and then described to her what had happened. He told her he had gone to Giardino's apartment with Ballard and Martinez earlier that morning. Defendant said he "hit [Giardino] over the head with the flashlight" sometime after they entered the apartment. Defendant told her the other two men had firearms. Defendant indicated Ballard shot Giardino in the shoulder after defendant hit Giardino with the flashlight. Defendant was shocked that Ballard shot Giardino. Ballard and Martinez wore ski masks; defendant's face was not covered.

### 3. Percipient Witness Angel Farfan

Angel Farfan testified at the evidentiary hearing about his interactions with Giardino. He was aware of a dispute between Giardino and Martinez involving a car theft sometime before the shooting. Giardino had been arrested for the theft, and was suspected of having implicated Martinez.

3

Farfan was present when Giardino was killed in 2002. Farfan had planned to spend the night at Giardino's apartment. The evening of the homicide, Farfan was at the apartment with Giardino, a woman, and her infant. Farfan testified that Giardino spoke to Martinez on the phone that night, and Giardino told Farfan that Martinez was going to come by the apartment. Farfan fell asleep, and awoke in the early morning to the sound of Giardino grunting and trying to push the front door closed. Giardino fell backward, and four perpetrators came into the apartment. All of the perpetrators wore masks. One man placed a gun against Farfan's head and ordered him to the ground; Farfan thought the man was probably Martinez. Another perpetrator ordered the woman to the floor at gunpoint. A third perpetrator with a gun that appeared to be a revolver was "walking back and forth yelling for money"; Farfan believed this perpetrator was "African-American" based on speech and neck area skin tone. He did not remember seeing anyone with a flashlight.

Farfan heard a scuffle and looked toward Giardino. Giardino had a trickle of blood coming down his forehead. Farfan saw Giardino reach toward his pocket, and then heard a loud gunshot. The man who had been pacing was the shooter. It looked like Giardino had been shot in the shoulder. The person holding the gun next to Farfan's head lifted the gun briefly and then put it back on Farfan's head, apparently in reaction to hearing the gunshot. The shooter ran to the back of the apartment briefly and returned holding a little bag of money. The perpetrators all left once the shooter announced he had the money.

Farfan got up and checked on Giardino, confirming he had been shot. He instructed the woman to clean the kitchen because he thought Giardino was making crystal methamphetamine in the apartment and believed there were drugs in the kitchen. Farfan wanted to move Giardino out of the apartment so that the police would not find any illicit substances. Farfan ran to a friend's apartment and returned with the friend to help move Giardino. They moved him just outside the apartment door by some stairs.

4

Someone called 911, and Farfan stayed with Giardino until the police arrived. Farfan did not realize how badly Giardino had been injured by the gunshot until they were outside. Giardino was moaning before the police arrived. Farfan admitted that he initially lied to the police about different aspects of the event, partly in an effort to protect Giardino and the woman from being implicated in criminal activity.

### 4. Coparticipant Martinez

Coparticipant Alfred Martinez testified at the evidentiary hearing in support of his own resentencing petition. The trial court determined that the testimony was admissible as to both Martinez's and defendant's resentencing petitions. (We note defendant did not summarize or otherwise mention Martinez's testimony in his appellate briefing.)

Martinez and Giardino were close friends in 2002. He also knew Farfan through Giardino. Martinez was also friends with Ballard, but Ballard had never been introduced to Giardino or Farfan. Martinez knew defendant through Ballard, but he was not a close friend of defendant. Giardino sold methamphetamine, and would "clean" it in his apartment with a chemical to create crystal methamphetamine. Martinez also sold methamphetamine that he purchased from Giardino. No one in the groups Martinez spent time with in 2002 was a gang member or a violent person. Martinez acknowledged that at the time of the homicide he was on parole for a drug possession conviction.

Martinez described an incident in which he stole a car while he was with Giardino. Martinez was later arrested for stealing the car, and he believed that Giardino had snitched on him to the police. Feeling betrayed, Martinez decided to steal drugs from Giardino. Martinez told Ballard and Farfan about his plan to steal drugs from Giardino several hours before the homicide occurred. Martinez went to Ballard's residence and discussed the plan. They included Farfan in the plan to be their "eyes and ears on the inside" of Giardino's apartment. Martinez expected they could steal a pound of methamphetamine from Giardino, based on the quantity of drugs Giardino usually possessed.

5

The plan was to go to Giardino's apartment wearing masks, knock on the door, get inside, tie up Giardino, and steal the methamphetamine. Martinez planned to go to the apartment in the early morning, after 2:00 a.m., to reduce the risk of anyone else being present. Farfan would tell Martinez in advance who was at the apartment. Violence was not part of the plan, as Martinez did not think that Giardino would resist; Giardino was not a violent person, nor did he own any weapons. Martinez also did not expect Ballard to be violent, because he had never seen him act violently.

Martinez called Farfan shortly after midnight, and Farfan told him he was at Giardino's apartment with Giardino and a woman. Martinez testified that Farfan had lied when he testified at the evidentiary hearing that Martinez spoke only with Giardino on the phone that night. Defendant joined the plan shortly before Martinez and Ballard left Ballard's residence. Defendant drove them to Giardino's apartment around 3:30 a.m. Martinez and Ballard brought guns, at Ballard's suggestion. Defendant had rope, tape, and a flashlight. It was a "Mag flashlight," made of metal, the type that uses size D batteries. Martinez and Ballard wore masks, defendant did not. Martinez told Ballard and defendant "over and over" that there would be no need for violence because no one would resist.

Martinez instructed defendant to knock on the door and say that it was "Berta," while Martinez and Ballard stood to the side of the door. Giardino opened the door and the three men forced the door open. Giardino fell back onto the ground. Martinez went to Farfan and told him to get down. Martinez heard a "bam" that was not a gunshot, but denied seeing defendant hit Giardino with a flashlight. Ballard demanded money, and then Martinez heard a gunshot. Martinez was surprised that Ballard demanded money because the plan was to steal drugs. After Giardino said there was money in the laundry, Martinez and defendant grabbed laundry baskets and the three men fled the apartment. Ballard did not retrieve a paper bag of money, none of the robbers ended up with any money from Giardino's apartment, and the whole encounter happened very quickly.

6

Martinez talked to the police about the incident several times, and he acknowledged in his testimony that he did not always tell them the truth. A recording of Martinez's police interrogation was admitted into evidence. Martinez told police that Ballard informed defendant of the robbery plan as follows: "We're going to go over there and fucking do Billy in. We're going (inaudible) his dope (inaudible). And [defendant] ... wasn't even tripping. He was like, 'All right let's go.' " Martinez told the police that defendant hit Giardino in the head two times with a "big-ass flashlight." Martinez did not know whether defendant hit Giardino before or after he was shot.

### 5. Medical Evidence

A Santa Clara County medical examiner testified about reviewing records related to Giardino's autopsy. The doctor confirmed Giardino had a laceration on his head that was the result of a blunt force injury and could have been caused by a flashlight. There were two other blunt force injuries, one on the left side of Giardino's forehead and one on his left thumb. The doctor agreed that the three blunt force injuries were minor and did not contribute to death. The cause of death was the gunshot wound, which punctured and collapsed both of Giardino's lungs and punctured his aorta.

### B. TRIAL COURT DECISION

The trial court denied defendant's resentencing petition. It determined beyond a reasonable doubt defendant was a major participant because he provided the ruse at the door to get into Giardino's apartment; was armed with and used a deadly weapon (the flashlight); was inside the apartment and near Giardino when he was shot; and had a preexisting relationship with the shooter. The court further determined beyond a reasonable doubt that defendant acted with reckless indifference to and conscious disregard for human life. The latter finding was based on defendant's willing participation in a home invasion robbery of a drug dealer where he personally used a deadly weapon by striking Giardino in the head with a flashlight. The court explained that a "critical factual piece" supporting its decision was defendant's willingness to "be

7

hands-on with the victim," carrying out an unprovoked "act of extreme violence" to a vital part of Giardino's body. The act "heightened the risk of resistance," decreased Giardino's ability to defend himself, and "increased the likelihood of panic." The court noted defendant had already admitted the flashlight was a deadly or dangerous weapon when admitting the section 12022, subdivision (b) enhancement as part of his plea. The court further found that defendant knew firearms would be involved.

## II. DISCUSSION

Defendant argues the trial court's decision must be reversed for lack of substantial evidence supporting the court's alternative conclusions that defendant was a major participant in the home invasion robbery who acted with reckless indifference to human life, or that defendant aided and abetted an implied malice murder.

In response to defendant's resentencing petition, the prosecution was required to prove beyond a reasonable doubt that defendant was guilty of murder under current California law. (§ 1172.6, subd. (d)(3).) Applying the proper standard, the trial court found that defendant was guilty of murder as a major participant in the robbery who acted with reckless indifference to human life (see § 189, subd. (e)(3)), a conclusion we review for substantial evidence. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 590–591.) "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We do not reweigh evidence or second-guess credibility determinations. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) We presume the existence of every fact the trier of fact could reasonably deduce from the evidence to support the judgment. (*Ibid.*) To overturn a conviction based on insufficient evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

8

Defendant does not dispute that he was a major participant in the robbery. He challenges only the finding that he acted with reckless indifference to human life. The Supreme Court has identified the following factors as relevant to the reckless indifference analysis: defendant's knowledge of weapons, the number of weapons, and defendant's use of weapons; defendant's physical presence at the crime and opportunity to prevent the crime or help the victim; the duration of the felony; defendant's knowledge, if any, of an accomplice's likelihood to kill; and defendant's efforts to minimize the risk of violence during the felony. (*People v. Clark* (2016) 63 Cal.4th 522, 618–622 (*Clark*).) " '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id*. at p. 618.) Despite not contesting the major participant finding, defendant discusses both the *Banks* major participant factors and the *Clark* reckless indifference factors in his briefing. (*People v. Banks* (2015) 61 Cal.4th 788.) We focus on *Clark*, as those are the factors relevant to our analysis.

Substantial evidence supports a finding that defendant knew weapons would be present in the robbery. It is undisputed that Ballard and Martinez possessed and brandished guns, and defendant's former girlfriend testified that he told her Ballard and Martinez were armed. Defendant points to his statement to police that he did not became aware of the firearms until immediately before the men entered the apartment. But even accepting that statement as true, defendant was aware of the firearms before entering the apartment. Substantial evidence also supports a finding that defendant himself possessed a weapon in the form of a flashlight.

Substantial evidence supports a finding that three deadly weapons were used in the robbery. Defendant contends that the two guns were the only deadly weapons. But the evidence shows defendant struck Giardino in the head with a flashlight, and two blunt force head injuries were observed in the autopsy. Striking a person's head with what coparticipant Martinez described as a "big-ass" metal "Mag" flashlight is a use not only capable of producing but also likely to produce death or great bodily injury. (See *In re*

9

*B.M.* (2018) 6 Cal.5th 528, 533.) Defendant also admitted the flashlight was a deadly or dangerous weapon under section 12022, subdivision (b) as part of his plea. That the head trauma was minor in comparison to the fatal gunshot wound does not negate defendant's use of the flashlight in a dangerous and potentially deadly manner.

We acknowledge the conflicting testimony about the number of times defendant hit Giardino with the flashlight and about whether he did so before or after Ballard shot Giardino. We also acknowledge the trial court's statements on the point: indicating it "believe[d] that the evidence shows that it was twice not once," and also that "[i]f the blows to the head ... occurred after the shooting, it must have occurred very shortly after." Reviewing the record in the light most favorable to the judgment, substantial evidence supports findings that defendant struck Giardino twice before Giardino was shot. Martinez stated during his interrogation that defendant hit Giardino twice with the flashlight. And defendant's interrogation and statements to his then-girlfriend indicated the flashlight strikes occurred before the shooting.

Substantial evidence supports findings that defendant was present at the crime and made no effort to help the victim. It is undisputed that defendant was an active participant in the robbery and was inside the apartment when Giardino was shot. It is also undisputed that defendant made no attempt to aid Giardino after the shooting, instead fleeing with Martinez and Ballard. Defendant suggests his flight does not support a reckless indifference finding because Farfan and a woman were on scene to render aid and "no one at the scene imagined the shooting was fatal." But the complete failure to check on the victim of a gunshot wound, regardless of how severe the injury appeared, supports a finding of reckless indifference.

Substantial evidence supports a finding that defendant made no effort to minimize the risk of violence during the felony. To the contrary, defendant affirmatively used violence during the felony by striking Giardino in the head. Defendant notes that he was shocked and upset when later describing the incident to his then-girlfriend, and contends

10

that would not be the reaction of a callously indifferent person. But there was also evidence supporting a finding that defendant was aware of the possibility for violence by coparticipants before the robbery. Martinez stated in his interrogation that Ballard told defendant, "We're going to go over there and fucking do Billy in. We're going (inaudible) his dope (inaudible). And [defendant] ... wasn't even tripping. He was like, 'All right let's go.' " The record does not clarify what "do[ing] Billy in" envisioned, but seen in the light most favorable to the judgment, a rational trier of fact could conclude Ballard was suggesting the possibility of violence.

The foregoing evidence of three of the five *Clark* factors supports the trial court's conclusion that defendant acted with reckless indifference to human life. As to the remaining *Clark* factors, we acknowledge that the duration of the robbery was short, and there was no evidence that defendant knew of either Martinez's or Ballard's propensity for using lethal violence. But the absence of some factors does not negate the substantial evidence of other factors supporting the trial court's decision.

We are not persuaded by defendant's focus on the presence or absence of certain factors in isolation, rather than the entire evidentiary record. He contends that while he "may have known guns were to be used in the robbery, this, as all courts recognize, is not enough" to establish reckless indifference to human life. But as we have discussed, defendant's awareness of his coparticipants' weapons was just one of multiple factors supporting the trial court's decision. He argues his conduct was less culpable than that in *In re McDowell* (2020) 55 Cal.App.5th 999, 1013, which also found reckless indifference by a participant in a home invasion robbery of a drug dealer. But the distinguishing facts defendant identifies do not mandate reversal, especially where evidence in this case suggests greater culpability than McDowell's (e.g., defendant struck Giardino's head with a large flashlight, whereas McDowell brandished a pen knife). (*McDowell*, at p. 1011.) And *People v. Ramirez* (2021) 71 Cal.App.5th 970, cited as an example of a

11

homicide that occurred so quickly the defendant did not have time to intervene, is distinguishable because the defendant in that case "was not armed." (*Ramirez*, at p. 993.)

Because substantial evidence in the record supports the trial court's finding that defendant was a major participant who acted with reckless indifference to human life, we do not reach the parties' arguments about the trial court's alternative determination that defendant aided and abetted a second degree murder.

## III.    DISPOSITION

The order denying defendant's resentencing petition is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Lie, J.

**H049541**
*The People v Barrientos*