Filed 4/12/21  P. v. Carrera CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058437 |
| v. | (Super. Ct. No. 19NF1579) |
| JAMES EUGENE CARRERA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Strickroth, Judge.  Affirmed in part, reversed in part, and remanded.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Steven T. Oetting and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

James Eugene Carrera got into a physical altercation with two people. The jury convicted him of assault with a deadly weapon and simple assault as to the first victim, and misdemeanor battery and simple assault as to the second victim. The trial court sentenced Carrera to a four-year prison term and imposed various fines, fees, and assessments. In his appeal, Carrera asserts (1) there was insufficient evidence to support his convictions for assault with a deadly weapon against the first victim, (2) the simple assault committed against the second victim must be dismissed because it is a lesser included offense of battery, and (3) the case must be remanded for a hearing on his ability to pay the restitution fine and assessments. We agree with his second contention that the assault conviction cannot stand, and because the matter must be remanded for resentencing, the court may hold a hearing on Carrera's ability to pay the restitution fine, fees, and assessments. In all other respects, we affirm the judgment.

FACTS

On the day of the altercation, Juan V. (Juan) and his assistant Trevor P. (Trevor) were making repairs to a vacant apartment unit.[1] Juan was the apartment complex's property manager. As Juan was throwing away some trash in a bin behind the complex, he noticed Carrera approach from an adjacent alleyway situated approximately 100 feet away. Juan recalled he saw Carrera was "walking strange from corner to corner yelling and laughing and screaming[.]" Juan began speaking with Martha H., one of the apartment tenants who also assisted Juan with management duties. Juan turned his back to the alley when he spoke with Martha because she was standing inside a nearby garage.

Martha saw Carrera approach her garage and he was holding a bottle of alcohol. She recalled he appeared to be "under the influence of some kind of drug or something." She explained that the reason she believed he was under the influence was

---

[1] We will refer to the victims by their first names to protect their privacy.

2

because he "looked weird" and was "talking too much." Carrera was not smiling, and Martha feared he was going to do "something bad" and she ran away.

Meanwhile, Carrera positioned himself directly behind Juan. He asked Juan to give him three dollars in exchange for a full-looking tequila bottle. Like Martha, Juan perceived Carrera was under the influence because he was "acting weird" and "not standing properly." Juan stated he did not have any money, and Carrera became angry and more insistent on making the sale.

Carrera wrapped his arm around Juan's neck in a headlock, and pulled him close while loudly stating, "come on man, I need money, just buy it off me, I need to go to Huntington Beach." Next, Carrera pulled his arm tighter and bumped his head hard against Juan's head. After being head-butted, Juan felt pain and was afraid. He heard Carrera tell him to ask his wife (referring to Martha) if she had money.

Unable to break free from Carrera's headlock, Juan pulled Carrera towards the apartment where Trevor was working, hoping Trevor would help him. Juan got Trevor's attention by calling his name. Trevor did not immediately react because it looked as if Carrera was Juan's friend, embracing him around his neck. However, Trevor intervened after he saw Juan motion for Trevor to call the police by making a phone sign with his hands and mouthing the words. Instead of calling the police, Trevor was able to break Juan free from Carrera's headlock. Once out of Carrera's grasp, Juan moved himself away from Carrera and dialed 911.

After separating Carrera from Juan, Trevor went inside the apartment unit intending to call the police. He was unable to make the call because Carrera followed him inside and began speaking to him in Spanish. Trevor, who was not fluent in Spanish, believed Carrera was trying to sell him the tequila bottle he was holding. Carrera tried to give Trevor a hug. Trevor and Carrera walked outside the apartment, and Trevor let Carrera hug him. Trevor explained, "I didn't want to come off aggressive or antagonistic, so I felt keeping the friendly attitude was better." Once outside, Carrera

3

asked Trevor to pay four or five dollars for the tequila.  When Trevor declined, Carrera opened the bottle and took a drink.  Trevor heard Carrera say a few words in English, calling the tequila a "blessing" and he tried to give Trevor a drink.  Carrera gave Trevor the bottle, and Trevor set the bottle on the ground.

Carrera walked into the empty apartment unit and dropped a bag he was carrying, while muttering, "'these fuckers moved out.'"  When Trevor asked Carrera to come outside the apartment, he complied and moved towards Trevor to give him another hug.  Trevor noticed this hug was different because he felt Carrera touch his front and back pockets.  Carrera then hit Trevor twice in the ribs.  Trevor described the attack as two unfriendly quick jabs with a closed fist.  The contact left red marks, but Trevor did not feel any pain.  Juan, who was speaking on his cell phone with the police dispatcher a short distance away, confirmed he saw Carrera hit Trevor twice.

Trevor responded by pushing Carrera away and raising his fists.  Carrera shook his head to indicate he did not want to fight.  Trevor returned to the apartment to retrieve Carrera's bag and, with his back turned to Carrera, he heard the sound of glass breaking.  Trevor gave Carrera the bag and "calmly but firmly" told him to leave.  Carrera grabbed his bag and ran.  Carrera next encountered Juan, who was outside by the trash cans and talking on the cellular phone with police dispatch.

From a distance of approximately 15 feet away, Juan watched Carrera toss the bottle to the floor and pick up a piece of the broken glass.  Carrera moved towards Juan with the sharp edge of the glass facing Juan.

Juan heard Carrera angrily assert, "[T]his is all because of you, this is all because of you."  Juan was afraid and understood Carrera was very mad and serious about trying to hurt him.  Juan saw Carrera's arm was "sort of reeled back" and he was afraid Carrera was going to kill him.  Juan started backing away from Carrera while continuing to talk on the phone to the police.  When Carrera was just a few feet away, Juan stated that if he came any closer, he would call the police.  To Juan's surprise,

4

Carrera tossed the glass aside and ran away. The police later detained Carrera, and Juan positively identified him at an in-field identification.

Police officer David MacShane, who found Carrera walking shirtless down the street, opined Carrera displayed symptoms of someone being under the influence. Carrera was calm and admitted he had been drinking. MacShane asked Carrera to sit on the curb, and when Carrera put his head between his legs, he either passed out or fell asleep.

An information charged Carrera with aggravated assault (Pen. Code, § 245, subd. (a)(4),[2] count 1 [Juan]), assault with a deadly weapon (§ 245, subd. (a)(1), count 2 [Juan]), misdemeanor battery (§ 242, count 3 [Trevor]), and simple assault (§ 240, count 4 [Trevor]). It also alleged Carrera had suffered a prior serious felony within the meaning of section 667, subdivision (a)(1), and a prior "strike" within the meaning of sections 667, subdivisions (d) & (e)(1)(A), and 1170.12, subdivisions (b) & (c)(1)(A).

At trial, defense counsel attempted to impeach and highlight inconsistencies in Juan's testimony. Among the topics counsel discussed, was Juan's failure to tell the 911 operator he was head-butted. When asked about this, Juan stated, "I believe I told them that he hurt me. I couldn't specify how he did." Juan also denied having seen Carrera in the area before, but the apartment owner testified Juan informed her about past issues with Carrera. Counsel also asked Juan to explain why he told police officers the apartment had surveillance cameras outside, but he did not provide any images of the incident. Juan claimed the cameras were not operational on the day of the incident. In addition, defense counsel drew attention to Juan's inconsistent testimony about the distance between himself and Carrera when he was holding the broken shard of glass. At the time of the incident, Juan told a police officer Carrera was 10 feet away when he picked up a broken piece of the bottle. At the preliminary hearing, Juan testified Carrera

_____

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

5

was 25 feet from him when he tossed and broke the bottle and picked up the broken neck. At trial, Juan testified the distance was 15 feet and that Carrera had picked up the bottom of the broken bottle.

The defense case consisted of three witnesses. The parties stipulated that if Trevor's grandmother (Grandmother), who owed the apartment complex, had been called as a witness she would have testified Juan "had issues with . . . Carrera in the past." They stipulated her testimony would provide the following evidence: "[Juan] informed [Grandmother] that . . . Carrera would always cut through their property to get onto Commonwealth Avenue. [Juan] described . . . Carrera to be belligerent and mouth off when asked not to cut through the property. [Juan] told [Grandmother] that he stopped saying anything to . . . Carrera because of his behavior."

Carrera's 16-year-old brother (Brother), lived with his grandmother in an apartment that abuts the alleyway adjacent to the property where the altercation took place. Brother saw Carrera frequently outside in the alleyway. On three occasions, he saw Juan harassing Carrera. Juan also harassed Brother by saying he looked like a gangster and asked him to leave the area. Carrera's grandmother, who lived with Brother, stated Carrera would visit her apartment daily and he was welcome there.

A jury found Carrera guilty of the lesser included offense of assault for count 1, and guilty as charged on the remaining counts. In a bifurcated bench trial, the court determined Carrera's prior conviction was true and denied his request to reduce count 2 (assault with a deadly weapon) to a misdemeanor. The court sentenced him to four years in prison, consisting of the low term of two years for count 2, doubled on account of his prior "strike" offense, and concurrent 180-day county jail terms for counts 1 and 3. The court stayed the imposition of the sentence on count 4 and dismissed the serious felony prior enhancement. The court imposed a $300 restitution fine (§ 1202.4), and a $300 parole revocation fine (§ 1202.45), which was stayed pending successful

6

completion of parole.  The court also imposed and stayed a court operations assessment of $160 (§ 1465.8) and a court facilities assessment of $120 (Gov. Code, § 70373).

DISCUSSION

I. *Sufficiency of the Evidence*

Carrera asserts there was insufficient evidence to support his conviction for assault with a deadly weapon.  Specifically, he focuses on the purported lack of evidence that the "manner in which the broken bottle was used in this instance" proved the glass shard was "capable of producing, and likely to produce, death or great bodily injury." We conclude the contention lacks merit.

A. *Applicable Legal Principles*

In considering a claim that insufficient evidence supports a criminal conviction, an appellate court "reviews the entire record, in the light most favorable to the judgment, for the presence of substantial evidence," which is "evidence sufficiently reasonable, credible, and of such solid value" that a reasonable trier of fact could have found "'the defendant guilty beyond a reasonable doubt.'  [Citation.]"  (*People v. Chatman* (2006) 38 Cal.4th 344, 389.)

In determining whether the record contains substantial evidence, we "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict.  [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)

7

Section 245, subdivision (a)(1), punishes assaults upon persons "with a deadly weapon or instrument other than a firearm." The term deadly weapon means "'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).) "Some . . . objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citations.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury." (*Id*. at p. 1029.) "For example, a bottle or a pencil, while not deadly per se, may be a deadly weapon within the meaning of section 245, subdivision (a)(1), when used in a manner capable of producing and likely to produce great bodily injury. [Citations.]" (*People v. Brown* (2012) 210 Cal.App.4th 1, 7 (*Brown*).) Great bodily injury, for purposes of section 245, means significant or substantial injury. (*Brown, supra,* 210 Cal.App.4th at p. 7.)

Determining whether an object that is not inherently deadly or dangerous was used as a deadly weapon is a question of fact for the jury. (*Aguilar, supra,* 16 Cal.4th at p. 1029.) "In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. [Citations.]" (*Ibid.*)

B. *Analysis*

In his briefing, Carrera acknowledges a broken glass bottle could be deemed inherently deadly or dangerous. (Citing *People v. Cabral* (1975) 51 Cal.App.3d 707, 712-713.) He asserts that in this case, however, there was insufficient evidence "the manner in which the broken bottle was used" was deadly or dangerous. He provides the following arguments to support this contention: (1) Juan's testimony was questionable because his claims about past interactions was refuted by other testimony; (2) there was

8

evidence Juan held a grudge against Carrera due to prior contacts; (3) it was suspicious the apartment's surveillance cameras were not operational the day of the incident; (4) Juan gave inconsistent accounts of the distance between himself and Carrera holding the broken glass, ranging from 25 feet to 10 feet; (5) Juan gave inconsistent accounts about where Carrera was holding the bottle (by the bottom or the neck); (6) Juan's testimony was untrustworthy because he did not mention Carrera approached him with the broken shard of glass to the 911 police dispatcher; (7) Juan did not initially mention the assault with the broken glass to the police, and consequently the crime scene investigator had to be called back to photograph the broken bottle's location; and (8) Juan testified Carrera held the bottle to his side and did not wave or display the glass.

Only the last contention directly addresses the question of whether *the manner* in which Carrera used the broken glass was capable of producing great bodily injury. All the other arguments pertain to whether Juan's account of the attack was credible. As mentioned, in reviewing the sufficiency of the evidence, we cannot resolve credibility issues or evidentiary conflicts. (*Zamudio, supra,* 43 Cal.4th at p. 357 ["'testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends'"].)

After reviewing the record, we conclude there was sufficient evidence to support the jury's conclusion regarding the manner of use. As discussed earlier, Juan provided a detailed account of the assault. He remembered Carrera "approached [him] with the glass, sharp edge facing [him]." Juan described feeling "afraid, really afraid." When questioned further, Juan elaborated, "I -- As soon as he started coming towards me with the bottle in his hand trying to hurt me saying, 'this is all because of you,' I thought I was gonna [*sic*] die for the first time." When counsel asked Juan if Carrera was holding the bottle down by his side "like this," Juan replied "no," however, the record does not

9

indicate what motion counsel was making.  Later, Juan indicated Carrera was holding the weapon with his right hand somewhere between his hip and rib area.  Thus, the bottle was certainly near Carrera's side but also positioned with the "glass shards . . . pointing" towards the victim.  Moreover, Carrera's arm was "sort of reeled back."  On cross-examination, Juan added Carrera "came fast towards" him.

When viewed in context, Carrera's rapid advance amply supports the conclusion Carrera wielded the broken shard of glass in a manner likely to produce death or great bodily injury.  Carrera did not casually pick up a glass bottle in a non-threatening manner while speaking with a friend.  Rather, only moments before breaking the bottle, Carrera forced Juan into a strong headlock, from which Juan needed help breaking free.  Carrera injured Juan by head-butting him.  Carrera did not calmly walk towards Juan after collecting a sharp piece of broken glass.  He reeled his arm back as he rapidly advanced forward with the jagged edge pointed toward Juan.  If Juan had not backed away or dissuaded Carrera by stating he was calling the police, it was likely Carrera would have cut and injured Juan with the weapon he created.

We are not persuaded by Carrera's argument there was "no evidence" he threatened Juan with the bottle because he held it by his side rather than waving it or displaying the "bottle in a threatening manner."  This assertion ignores Juan's testimony he felt afraid because Carrera angrily held a *broken piece of glass,* not just a bottle.  And, although Carrera held the weapon by his side, he wound his arm backwards as he quickly moved forward.  This supported the conclusion Carrera was preparing to propel his arm forward with added momentum and force in anticipation of contact with Juan.  We also cannot overlook that Carrera advanced after asserting Juan was at fault for something.  Because it appeared Carrera was blaming Juan for wrongdoing as he approached with a weapon, it was reasonable for the jury to conclude Carrera intended some sort of retaliation.  He had already proved himself capable and unafraid of striking Juan and Trevor.  Other courts have held that an assault with a deadly weapon can occur even

10

when the defendant never swings the weapon. (See *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1168 [affirming conviction for assault with deadly weapon where defendant held up knife to victim and asked, "'Do you want to do this?'"].) We conclude the jury had ample evidence from which to conclude Juan would have been stabbed, sliced, or otherwise seriously wounded by the sharp glass shard had he not moved out of the way.

Citing to *In re B.M.* (2018) 6 Cal.5th 528 (*B.M.*), Carrera notes Juan was not actually injured and evidence of "the mere possibility of a serious injury" was insufficient to support the conviction. That case is not analogous to this one. In the *B.M.* case, our Supreme Court clarified what it means for an object to be "'used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.'" (*Id.* at pp. 532-533.) There, the minor, B.M., stabbed at her sister's blanket-covered legs using a butter knife. (*Id.* at p. 531.) The evidence showed the butter knife did not "pierce" the blanket or cause the sister serious bodily injury. (*Id.* at p. 531.) Based on these facts, the Supreme Court found it "questionable" whether the knife was "capable of causing great bodily injury" and there was insufficient evidence to support that the minor's use of the knife was "likely to do so." (*Id.* at pp. 530, 533, 539.) The court clarified the meaning of the statutory language "likely to cause" in several respects.

First, the prong "requires more than a *mere possibility* that serious injury could have resulted from the way the object was used." (*B.M., supra*, 6 Cal.5th at p. 534, italics added.) Second, "the determination . . . must rest on evidence of how the defendant actually 'used' the object" rather than "conjecture as to how the object could have been used." (*Ibid.*) Third, "the extent of actual injury or lack of injury is also relevant" because it "may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Id.* at p. 535.) The court explained the appellate court engaged in conjecture when concluding the minor could have injured her sister's face because the evidence showed the minor used the

11

butter knife only in the area of her sister's covered legs. "There is no evidence that B.M. stabbed, sliced, or pointed the butter knife toward or near [her sister's] face, or that B.M. attempted or threatened to do so. Nor is there evidence that B.M. was flailing her hand with the butter knife or otherwise wielding it wildly or uncontrollably. [Citation.]" (*Ibid.*) The Supreme Court concluded the appellate court's "inference of potential injury based on evidence of how B.M. actually used the butter knife" was not reasonable. Finally, the court clarified that "an aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway." (*Id.* at p. 537.)

Applying these principles, the Supreme Court concluded the minor's use of the butter knife was not likely to cause death or great bodily injury. (*B.M., supra,* 6 Cal.5th at pp. 536-537.) In contrast, Carrera broke a bottle to make a sharp pointed weapon, unlike a blunt butter knife, that could easily cut or wound anyone in close contact. Carrera's strength and ability to cause harm was evidenced by his prior conduct of holding Juan in a headlock and head-butting him. Finally, unlike the *B.M.* case, this is not a case where the lack of injury is attributable to the nature of the object or the manner in which it was actually used. (*B.M., supra*, 6 Cal.5th at pp. 534-535.) The evidence indicates the lack of injury was likely because Juan fortuitously backed away as Carrera moved towards him and his threat to call the police eventually dissuaded Carrera from continuing. The fact great bodily injury was avoided does not help Carrera. (*B.M., supra,* 6 Cal.5th at p. 537.)

In conclusion, Carrera's homemade weapon was sharp enough to cut Juan, who was not protected by anything that would have stopped the weapon's progress had Carrera actually made contact. Here, the lack of an injury does not suggest the razor-sharp glass shard was unlikely to produce serious bodily injury. Based on all of the above, we conclude substantial evidence supports the jury's conclusion that the described

12

use of glass shards was either capable of causing, or likely to cause, great bodily injury to Juan.

II. *Lesser Included Offense*

Carrera was convicted of both misdemeanor battery (count 3) and misdemeanor (assault) with respect to his interaction with Trevor. He asserts assault is the lesser included offense of battery because the convictions are based on the "single act of 'two quick jabs'" to Trevor's ribs. The Attorney General asserts the convictions did not arise out of the same act or course of conduct. It maintains that when Carrera hit Trevor the first time, he completed the battery alleged in count 3. When he struck Trevor a second time, he committed a separate and distinct act of assault. It asserts, "The fact that the second punch . . . found its mark does not negate the jury's simple assault verdict." The Attorney General asserts the "completed act test" permits multiple convictions involving the same offense. We disagree.

A. *Applicable Legal Principles.*

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." (§ 954, italics added; [citation].)' [Citation.] Section 954 generally permits multiple conviction. Section 654 is its counterpart concerning punishment. It prohibits multiple punishment for the same 'act or omission.' When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited. [Citations.]" (*People v. Reed* (2006) 38 Cal.4th 1224, 1226-1227 (*Reed*).)

In this case, the trial court stayed execution of the sentence on the assault (count 4) conviction after determining the crime arose out of the same act or course of conduct as the battery (count 3). Therefore, multiple punishment is not at issue. The

13

question presented is whether there could be multiple convictions for Carrera's conduct with respect to Trevor.

As Carrera correctly points out, "A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' [Citation.] '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' [Citation.]" (*Reed, supra,* 38 Cal.4th at p. 1227.) It is well settled, "A defendant who commits a battery may not be convicted of both battery and assault, because '[a]n assault is a necessary element of battery, and it is impossible to commit battery without assaulting the victim.' [Citation.]" (*People v. Ortega* (1998) 19 Cal.4th 686, 692, disapproved on another ground in *Reed, supra,* 38 Cal.4th at p. 1228.)

B. *Analysis*

The Attorney General asserts the following theory: "The restriction on multiple convictions makes sense where the lesser offense is committed in the course of committing the greater offense. A person who raises his fist (a simple assault) and then proceeds to strike a victim (a battery) could not be convicted of both offenses. (See, e.g., *People v. Greer* (1947) 30 Cal.2d 589, 597[3] ["An assault is a necessary element of battery, and it is impossible to commit battery without assaulting the victim"]; *People v. McDaniels* (1902) 137 Cal. 192, 194 ["there can be no battery without an assault"].) On the other hand, where the greater offense has been completed, there should be no bar to conviction of a subsequent lesser offense. Thus, in the example above, if the defendant strikes a victim, and thereafter raises his fist to threaten a separate assault, there should be no reason why the defendant could not be charged with both offenses."

---

[3]     *People v. Greer* (1947) 30 Cal.2d 589, 596-597, not followed on other grounds in *People v. Pearson* (1986) 42 Cal.3d 351, 358, and overruled on other grounds by *People v. Fields* (1996) 13 Cal.4th 289, fn. 6.)

14

Setting aside the "lesser include offense" issue for a moment, we must first address the premise of the Attorney General's argument that if the defendant repeatedly strikes a victim there should be no reason why the defendant could not be convicted of multiple assaults. This is incorrect.

Assault is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) We read this language to mean an attempt to inflict a single injury is a single assault. And our Supreme Court concluded over a century ago, the rapid and uninterrupted infliction of multiple blows on a victim is but one assault: "If one unlawfully assails another with his two hands, first striking at him with one hand and immediately thereafter with the other, no one would say that there were two offenses. The offense would be the one unlawful attempt, coupled with a present ability, to commit a violent injury upon the other's person, and each effort made in what constituted only the same attempt to accomplish this result would constitute only a single element of that attempt." (*People v. Oppenheimer* (1909) 156 Cal. 733, 740 (*Oppenheimer*).) This sound legal reasoning is still applicable today.

The cases cited by the Attorney General involved crimes specifically defining their completion separated by intervening events. For example, the Attorney General maintains we must apply the completed act test used by the Supreme Court in a case where multiple convictions involved the same offense. (*People v. Harrison* (1989) 48 Cal.3d 321 (*Harrison*) [defendant convicted of multiple digital penetrations of victim during 10-minute assault].) The case is inapt.

In *Harrison,* the court dealt with three different sexual assault convictions in which multiple convictions were easily identifiable since the statute governing them dealt with a particularized crime that had a well-defined endpoint. (*Harrison, supra*, 48 Cal.3d at pp. 328-329.) The Supreme Court considered the meaning of section 289, which "made clear that the crime [of forcible sexual penetration] is committed simply by causing a proscribed 'penetration, *however slight*.'" (*Ibid.*) From this "*however slight*"

15

language, the court "conclude[d] that, assuming all other elements of the offense are present, a *violation is complete the moment* such 'penetration' occurs." (*Ibid.,* italics added.) And from that conclusion, the court determined, "It follows logically that a *new and separate* violation of section 289 is 'completed' each time a *new and separate* 'penetration, however slight' occurs"—even when one proscribed penetration occurs immediately after another. (*Id.* at p. 329.)

The court also decided section 654 did not bar multiple punishments because after each act of digital penetration the victim was able to pull away. The court explained there was "no legal or logical bar to separate punishment where, as here, each of defendant's [digital penetrations] was clearly volitional, criminal and occasioned by separate acts of force. . . . [D]efendant should also not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his sexually assaultive behavior." (*Harrison, supra*, 48 Cal.3d at p. 328, italics omitted.) As discussed above, the relevant statutes do not define the crimes of assault or battery as being specifically completed at any particular moment, unlike section 289. The rapid and uninterrupted infliction of multiple blows on a victim is but one assault. (See *Oppenheimer, supra,* 156 Cal. at p. 740.)

The Attorney General also cites cases that have upheld more than one conviction when the defendant used multiple instrumentalities to inflict separate injuries over the course of the assault. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 63 [first count of assault based on injuries inflicted with a knife and second count based on injuries inflicted by blunt force trauma inflicted by punches and kicks to victim's body and head]; *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1471-1472 [single incident of domestic violence that included choking, stabbing, and beating victim supported three separate convictions for corporal injury on co-habitant].) Such was not the case here.

The Attorney General also directs our attention to *People v. Trotter* (1992) 7 Cal.App.4th 363, 366, where the defendant fired a gunshot at a police vehicle, fired a

16

second shot about a minute later, and fired a third shot moments after the second shot. The defendant did not appeal the three convictions for assault on a police officer, and the court only considered application of section 654.  It affirmed imposition of consecutive sentences, explaining, "even under the long recognized 'intent and objective' test, each shot evinced a separate intent to do violence." (*Id*. at p. 368.)  The case is inapt because here the trial court determined section 654 applied because the crimes (counts 3 and 4) arose out of the same act or course of conduct.

We note the prosecutor did not pursue the Attorney General's abstract theory of multiple assaults at trial.  There is nothing in the record suggesting the prosecutor intended to charge or convict Carrera of two assaults or two batteries based on the two blows.  The information alleged only one count of assault and one count of battery, and in closing argument, the prosecutor referred to Carrera's actions with respect to Trevor as a single act.  After discussing the charges relating to the head-butting incident, the prosecutor stated, "And we also have a simple battery *or* simple assault as to Trevor, that's as to those two quick jabs down there.  [¶] Trevor should be easy on this case, those counts should be very easy on you.  I think those are fairly undisputed, I would say." (Italics added.)

The prosecutor did not suggest count 4 was based on a blow distinct from the punches relied on to support count 3.  Defense counsel, in closing argument, twice told the jury count 3, battery, was for "the soft punches on Trevor" and count 4, assault, was "what came right before the soft punches."  Defense counsel argued the punches should not be called a battery based on Juan's statement to the 911 dispatcher that Carrera barely touched Trevor.  When the dispatcher questioned this, Juan stated Trevor was fine and it was "no big deal."  Counsel also argued there was no battery if there was no touching and no assault because Trevor did not anticipate the soft punches while he was being hugged.  Simply stated, the jury was asked to determine if the single

17

aggressive act was a battery or the lesser included offense of assault. But now the Attorney General is asking for two convictions for a single incident.

We conclude Carrera's two quick jabs did not reflect an attempt to inflict more than one injury and the two hits were not interrupted by intervening events. Consequently, we reject the theory Carrera's two jabs amounted to a separate criminal assault or two separate batteries. We conclude both convictions arose out of the same act or course of conduct, and because Carrera does not challenge the sufficiency of the evidence to support his conviction of battery, it is undisputed the evidence supports his conviction of the greater offense. Accordingly, we reverse the conviction of simple assault because Carrera cannot be convicted of both the greater and lesser offense. (*People v. Sanders* (2012) 55 Cal.4th 731, 736 ["When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed"].)

III. *Ability to Pay Restitution and Assessments*

During Carrera's sentencing hearing, the court rejected the probation department's recommendation that it impose a $1,000 restitution fine (§ 1202.4), reduced it to $300, and imposed a parole revocation restitution fine (§ 1202.45) in the same amount, which it stayed. The court clarified "This stay to be permanent upon successful completion of parole."

With respect to the mandatory criminal and court costs, the court asked defense counsel if she waived recitation of those fines and fees. Counsel replied, "Yes, your honor. I'd ask the court to waive any fees that the court can waive. My client clearly has no money. He's transient, he's going to prison, he's still a dependent until he's 21. The court ruled as follows: "All right, the court will stay payment to the end of

18

the parole period. Any motion to reduce or strike then based upon any ambiguity can be raised as to now and then as appropriate. His situation may change hopefully." It imposed a $160 court operations assessment (§ 1465.8); and a $120 court facilities assessment (Gov. Code, § 70373).

Carrera asserts that while a court may stay payment until the end of his parole period, the court must decide payment based on a defendant's present, not future ability to pay. (*People v Duenas* (2019) 30 Cal.App.5th 1157, 1164.) Accordingly, he maintains the matter must be remanded for the limited purpose of an ability to pay hearing. The Attorney General asserts Carrera forfeited his argument with respect to the restitution fine because his counsel did not object when the court imposed the minimum amount. With respect to the assessments, the Attorney General asserts the court lacked authority to stay execution until after he was released and completed parole but any error was harmless.

In the interests of justice, we conclude the court should hold an ability to pay hearing when the case is remanded for the other reasons stated in this opinion. The trial court's statements and actions suggest it had questions concerning Carrera's ability to pay fines, fees, and assessments. We need not decide if sentencing errors were forfeited or should be deemed harmless.

DISPOSITION

We reverse Carrera's conviction for simple assault (count 4) and remand the matter to the superior court as follows: (1) to hold an ability to pay hearing with respect to all previous fines, fees, and assessments imposed by the trial court; (2) to resentence Carrera; and (3) to amend the abstract of judgment accordingly, and forward a copy to the Department of Corrections and Rehabilitation, Division of Adult Operations.

19

We offer no opinion regarding how the superior court should rule on restitution, fines, or fees. In all other respects, we affirm the judgment.

O'LEARY, P. J.

WE CONCUR:

ARONSON, J.

GOETHALS, J.