Filed 8/11/21  P. v. Lobato-Lopez CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C088794 |
| Plaintiff and Respondent, | (Super. Ct. No. 72010634) |
| v. | |
| ROBERTO LOBATO-LOPEZ, | |
| Defendant and Appellant. | |

Defendant Roberto Lobato-Lopez attacked the mother of his children in the parking lot of her apartment.  He also used a knife to attack her brother-in-law and her neighbor, both of whom tried to help.  Later, defendant threatened the neighbor's family over the phone.

Following a jury trial, defendant was convicted of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)),[1] two counts of assault with a deadly weapon (§ 245, subd. (a)(1)), corporal injury to the parent of his children (§ 273.5, subd. (a)), and criminal threats (§ 422). The trial court sentenced defendant to a five-year eight-month state prison term.

On appeal, defendant contends there is insufficient evidence to support the criminal threats and one of the assault with a deadly weapon convictions, the criminal protective order issued on behalf of defendant and the victim's children was unauthorized, and by failing to object to the protective order trial counsel was ineffective.

Sufficient evidence supports the contested convictions and the protective order was authorized, albeit under a different statute. We shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.S. and defendant were in a romantic relationship for 13 years before separating. They had three children, El.L. (age 13), Et.L. (age 11), and R.L. (age 8). Defendant had visitation with his children from Friday to Sunday each week. He and A.S. would exchange the children at a local restaurant in Kings Beach.

A.S. drove to the restaurant to pick up the children at 6:00 p.m. on July 8, 2018. She told her friend and neighbor Maria R. to look for her at the restaurant if she did not return home by 6:30 p.m. When her children did not arrive after 15 minutes, A.S. called defendant, who did not answer. At around 6:15 p.m., El.L. texted A.S. that defendant had taken the children to A.S.'s home.

A.S. drove to her apartment, where she found defendant waiting in the parking spot next to hers. The children were inside the apartment. When A.S. left her car and shut the door, defendant grabbed her by the neck with one hand and started to choke her.

---

[1]     Undesignated statutory references are to the Penal Code.

2

After defendant forced her two steps back, both of them fell to the ground. A.S. lost consciousness. Upon awakening, defendant was holding a knife with an eight-inch blade to her neck.

After seeing the attack, Maria ran to her apartment to get her husband, Jorge E., and then called the police. Jorge left the apartment and told defendant to leave A.S. alone. Defendant told Jorge not to "butt in" because he was going to "do something." He let go of A.S. and went after Jorge as he held the knife in one hand. Defendant tried to "stick" Jorge with the knife, but Jorge jumped to avoid getting "stuck."

A.S. got up and tried to get to her apartment, but defendant grabbed her by the hair and dragged her down the street, saying he was going to kill her. Maria then called Jose L., A.S.'s brother-in-law, who lived nearby. Jose left his house and shouted to defendant to "Leave her." Defendant let go of A.S. and moved towards Jose. Defendant swung his knife at Jose three times, causing Jose to jump backward and hit a pine tree. Jose then ran back a few steps.

El.L., who was watching through a window, ran out of the apartment and told defendant to leave. The other two children followed their sister outside; all three hugged A.S. and started crying with their mother. Defendant stopped and said he was going to kill Jose and his family. He then left on foot. Defendant lived at a nearby motel.

Law enforcement arrived shortly thereafter. The deputy who spoke with A.S. noticed she had abrasions on both knees, a scratch on her left shoulder, and redness around her neck.

Defendant called Maria and Jorge about 20 minutes after he left the scene. Maria answered; defendant said he wanted to talk to Jorge. Maria put the phone on speaker and defendant said, in the presence of Maria, Jose, Jorge, and a deputy, "Jorge, I am going to kill you for not letting me do what I want to do." Defendant also said he was going to kill Jorge's family.

3

Later that night, defendant called A.S.'s home and left a message telling the children to hide because he was going to shoot up the house. He said, "[W]e're going to start shooting with other friends. We're going to kill everybody." Et.L. ran to her mother and aunt to tell them about the call.

A deputy met with A.S. the following morning to interview her and photograph her injuries. There was still redness around her neck.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant claims there is insufficient evidence to support the criminal threats conviction and the assault with a deadly weapon conviction regarding the assault on Jorge (count six). We disagree.

A. *Standard*

The standard of review for insufficient evidence claims is well established.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

B.  *Criminal Threats*

To establish criminal threats under section 422, the prosecution must prove: (1) the defendant willfully threatened to commit a crime causing death or great bodily injury to the victim; (2) the threat was made with the specific intent that it be taken as a threat—even absent intent to carry out the threat; (3) the threat " 'was, "on its face and under the circumstances . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat" ' "; (4) the threat caused the victim " ' "to be in sustained fear for his or her own safety or for his or her immediate family's safety" ' "; and (5) under the circumstances, the fear was reasonable.  (*In re George T.* (2004) 33 Cal.4th 620, 630.)

The criminal threats count is based on defendant's phone call to Jorge roughly 20 minutes after the incident, where he threatened to kill Jorge and his family.  Defendant claims there is insufficient evidence he specifically intended this be taken as a threat or that the threat communicated to the victim a serious intention and immediate prospect of it being carried out.  He is wrong.

"Section 422 makes illegal a threat which conveys a gravity of purpose and the '*immediate* prospect of execution.' " (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538.)  The word "immediate" means a "degree of seriousness and imminence which is understood by the victim to be attached to the future prospect of the threat being carried out, should the conditions not be met." (*Id.* at pp. 1532-1533, 1538 [the defendant's threats that he was going to blow mechanic away with a grenade if he did not return the defendant's car after the defendant failed to pay for services constitutes sufficient threat under § 422].)  The statute, however, "does not require an immediate ability to carry out the threat.  [Citation.]" (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679.)

A threat, moreover, " 'is not insufficient simply because it does "not communicate a time or precise manner of execution . . . .' " (*People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431-1432 [threats made while the defendant was incarcerated were sufficiently

5

"immediate" for purposes of § 422 given the totality of the circumstances including prior physical violence against victim].) " ' "[S]ection 422 does not require those details to be expressed." ' [Citations.]" (*Id*. at p. 1432.) Rather, "[t]he totality of the circumstances must be considered in addition to the words used. [Citations.]" (*People v. Smith* (2009) 178 Cal.App.4th 475, 480.)

Roughly 20 minutes before making the call, defendant assaulted Jorge with a knife, forcing Jorge to jump out of the way to avoid being stabbed. A jury could reasonably infer defendant knew where Jorge and his family lived, since they were the neighbors of the mother of his children and he had their phone number. Defendant lived close by and communicated his threat not long after the assault with a deadly weapon on Jorge. These circumstances—the prior assault, the short time between the assault and threat, defendant knowing where they lived and being near to them—are circumstances from which the jury could reasonably infer that defendant intended his communication be taken as a threat which would be carried out some point in the not too distant future. Substantial evidence supports the criminal threats conviction.

C. *Assault with a Deadly Weapon*

Defendant asserts there is insufficient evidence to support a finding that the knife he employed against Jorge was capable of producing or being likely to produce great bodily injury.

Section 245, subdivision (a)(1) punishes assaults committed "with a deadly weapon or instrument other than a firearm." As used in the statute, the term " ' "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' [Citation.]" (*In re B.M*. (2018) 6 Cal.5th 528, 532-533 (*B.M*.).) Section 245, subdivision (a)(1) contemplates two categories of deadly weapons. Objects such as dirks and blackjacks are deadly weapons as a matter of law because their ordinary use establishes their character as such. (*B.M*., at p. 533.) Other objects, while not deadly per se, may be used in a

6

manner likely to produce death or great bodily injury. (*Ibid.*) "Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons." (*People v. Aledamat* (2019) 8 Cal.5th 1, 6.)

Our Supreme Court established guidelines for determining whether a non-inherently dangerous object—such as a knife—was used in a manner likely to produce death or great bodily injury in *B.M.* (*B.M., supra*, 6 Cal.5th at pp. 533-536.) There, 17-year-old B.M. used a three-inch butter knife with a dull tip and serrated edge to scare her sister, Sophia. (*Id.* at p. 531.) When Sophia saw B.M. approaching with the butter knife, she covered herself with a blanket. (*Ibid.*) B.M. made several downward slicing motions with the knife in the area near Sophia's blanketed legs. (*Ibid.*) Although the butter knife made contact with Sophia's legs, the knife neither pierced the blanket nor caused injury to Sophia. (*Ibid.*)

The juvenile court found B.M.'s use of the butter knife violated section 245, subdivision (a)(1) and the Court of Appeal affirmed. (*B.M., supra*, 6 Cal.5th at p. 530.) Our Supreme Court reversed, announcing three principles to be applied in such cases. (*Id.* at pp. 530, 533-536.) "First," the court explained, "the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "*likely* to produce death or great bodily injury.' [Citation.]" (*Id.* at p. 533.) This requires more than a mere possibility that serious injury could have resulted from the object used. (*Ibid.*)

Second, conjecture as to how the object might have been used is not permitted. (*B.M., supra*, 6 Cal.5th at p. 534.) "Rather, the determination of whether an object is a deadly weapon under section 245, subdivision (a)(1) must rest on evidence of how the defendant actually 'used' the object. [Citations.]" (*Ibid.*) Although "it is inappropriate to consider how the object could have been used as opposed to how it was actually used," the Supreme Court explained, "it is appropriate in the deadly weapon inquiry to consider what harm could have resulted from the way the object was actually used. Analysis of

whether the defendant's manner of using the object was likely to produce death or great bodily injury necessarily calls for an assessment of potential harm in light of the evidence. As noted, a mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." (*Id*. at p. 535.)

Third, "limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*B.M., supra*, 6 Cal.5th at p. 535.) Nevertheless, an aggravated assault conviction does not require proof of any injury or even physical contact. (*Ibid*.)

The knife defendant employed was eight inches long and had a folding blade. A.S. had seen defendant sharpen the knife before. He first held the knife to the neck of A.S., and, after Jorge intervened, tried to "stick" him with it, causing Jorge to jump out of the way. Jorge first testified that defendant was about five feet from him when he swung, but later clarified his testimony with a courtroom demonstration using a marker as a substitute for the knife. Jorge showed defendant got closer to him, maybe a little more than two feet, and swung the knife in a side to side motion. As a result of defendant's attack, Jorge felt he had to jump out of the way to avoid getting hit by the knife, which he did.

Although we do not have defendant's height in the record, two feet would be well within arm's length for an adult male like defendant. This inference is further supported by the fact that Jorge felt he had to jump out of the way to avoid being struck by the knife. A knife eight inches long with a blade that defendant would sharpen has a much greater potential to inflict injury than the weapons involved in the cases defendant primarily relies on, *B.M.*, *In re Brandon T.* (2011) 191 CalApp.4th 1491, and *People v. Beasley* (2003) 105 Cal.App.4th 1078. *B.M.*, as previously discussed, involved an assault with a butter knife, which was also the case in *In re Brandon T.* (See *In re Brandon T.*, at pp. 1493, 1494.) In *In re Brandon T.*, the defendant tried to, but could not, pierce the victim's skin with a butter knife. (*Id.* at pp. 1497, 1498.) Likewise, *Beasley* involved an

8

attack with a plastic vacuum cleaner extension and a broomstick in which there was no evidence regarding the degree of force employed, or the nature of either weapon. (*Beasley*, at pp. 1087-1088.)

Here, by contrast, an eight-inch knife that defendant sharpens is capable of puncturing skin and thereby wounding the intended victim. Jorge's response, moving out of the way to avoid being stabbed, further support's the inference that the knife was capable of inflicting death or great bodily injury on him in the way it was employed. Substantial evidence supports the conviction.

## II

### *Protective Order*

Defendant asserts a protective order under section 273.5, subdivision (j) is not authorized as to A.S.'s and defendant's children, as they were not the victim of his domestic violence offense.

At sentencing, the trial court granted the prosecution's request to issue, pursuant to section 273.5, subdivision (j), a protective order forbidding contact with the victim A.S., and another order forbidding contact with their children, El.L., Et.L., and R.L., both running for 10 years. Defendant contends the order regarding the children was unauthorized. Although defendant did not object to the order, since his claim goes to the court's authority to issue the order, the contention is not forfeited. (*People v. Goldman* (2014) 225 Cal.App.4th 950, 961 [unauthorized sentence not subject to forfeiture].)[2]

Section 273.5, subdivision (j) states in pertinent part: "Upon conviction under subdivision (a), the sentencing court shall also consider issuing an order restraining the defendant from any contact with the victim, which may be valid for up to 10 years, as determined by the court. It is the intent of the Legislature that the length of any

---

[2]     Since we address the claim on the merits, we do not consider defendant's claim that trial counsel's failure to object to the order was ineffective assistance.

9

restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."  As such, section 273.5, subdivision (j) does not authorize a trial court to issue a protective order in favor of a child of a victim.  (*People v. Delarosarauda* (2014) 227 Cal.App.4th 205, 213.)

However, a criminal protective order could have been lawfully issued as to the children under section 136.2, subdivision (i)(1), which provides:  "In all cases in which a criminal defendant has been convicted of a crime involving domestic violence as defined in Section 13700 . . . the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with a victim of the crime. . . .  It is the intent of the Legislature in enacting this subdivision that the duration of any restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of a victim and his or her immediate family."  Accordingly, the trial court was statutorily required to consider imposition of a protective order under section 136.2, subdivision (i)(1) as part of the sentence in light of defendant's conviction for section 273.5.

"[F]or purposes of a section 136.2 protective order, 'victim' is broadly defined in section 136 as any person against whom there is reason to believe a crime has been committed" or attempted to be committed.  (*People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 466; see § 136, subd. (3).)

Section 273a, subdivision (b) provides:  "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."

10

Committing a felony assault on a parent can support a conviction for misdemeanor child endangerment. In *People v. Burton* (2006) 143 Cal.App.4th 447 (*Burton*), the defendant was convicted of misdemeanor child endangerment toward his eight-year-old son when the defendant slashed the face of the child's mother several times while the child was nearby. (*Id*. at pp. 450-451.) Although the child did not see the attack and was not in physical danger, he was nearby during the attack and saw his mother's bloody face immediately afterward. (*Id*. at p. 454.) The court in *Burton* concluded that substantial evidence supported the conviction of misdemeanor child endangerment. "A reasonable person would easily recognize that a child would endure unjustifiable mental suffering by being on the scene while his father slashed his mother's face several times, and then immediately seeing the horrible, bloody aftermath." (*Id*. at p. 455.) The court summarized its holding thusly: "[W]e conclude that a parent may be convicted of misdemeanor child endangerment under section 273a, subdivision (b), by engaging in serious domestic violence against the other parent while aware that his or her child is at the scene." (*Id.* at p. 450.)

The children were not taken by defendant to the restaurant to be returned to their mother, but were instead taken to their home, where they saw defendant commit a felony assault on their mother and then commit assault with a deadly weapon on a neighbor and on an uncle.[3] Once defendant left the scene, they ran out to embrace their mother and cry with her. Later, defendant called the house and told the children to hide because he and friends were going to shoot up the home and kill everybody. Although defendant took the children to their home before assaulting their mother, uncle, and a neighbor, the assaults were committed in close proximity to where they were placed, and the children

---

[3] Et.L. testified that after defendant put the children in their mother's home, "my sister went to go check out the door. And she saw like all the problems that were happening. And she screamed. So we went after her."

were able to find out their mother was being assaulted and witness it.  We conclude these facts support a finding under *Burton, supra*, 143 Cal.App.4th 447 that defendant committed misdemeanor child endangerment against his children.

As such, the trial court had authority to issue a protective order in favor of the children under section 136.2, subdivision (i)(1).  It is of no consequence that the trial court erroneously relied on section 273.5, subdivision (j) since " ' "[n]o rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion."  [Citation.]'  [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

We shall direct the trial court to correct the protective order.

DISPOSITION

The judgment is affirmed.  The trial court is directed to modify the protective order as to El.L., Et.L., and R.L. to reflect the proper statutory authorization, section 136.2, subdivision (i)(1).


/s/
BLEASE, Acting P. J.

We concur:


/s/
HULL, J.


/s/
MAURO, J.

12