Filed 8/19/24  P. v. Bogdanoff CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C097381 |
| Plaintiff and Respondent, | (Super. Ct. No. 62184332) |
| v. | |
| ZUBIN DIMITRI BOGDANOFF, | |
| Defendant and Appellant. | |

Defendant Zubin Dimitri Bogdanoff rammed his Jeep multiple times into two smaller cars.  He was convicted of two counts of assault with a deadly weapon and two counts of misdemeanor hit and run.  After finding true that Bogdanoff had prior strikes under the Three Strikes law and prior serious felonies, the trial court sentenced him to 50 years to life in state prison.

On appeal, Bogdanoff contends that the trial court erred in allowing him to continue representing himself when he was not mentally competent to do so.  He also argues that one of his convictions for assault with a deadly weapon was not supported by

substantial evidence. He further claims that the trial court was required to dismiss his prior strikes under the Legislature's recent amendments to Penal Code section 1385, subdivision (c) or under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.[1] We reject these contentions and affirm the judgment.

## BACKGROUND

A second amended information charged Bogdanoff with two counts of assault with a deadly weapon (§ 245, subd. (a)) and two counts of misdemeanor hit and run (Veh. Code, § 20002, subd. (a)). It further alleged that he had suffered prior strikes (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and had prior serious or violent felony convictions (§ 667, subd. (a)(1)).

At a bench trial, witnesses testified about two instances in October 2021 in which Bogdanoff rammed his Jeep into another car. The first victim, A.A., was driving 15 to 20 miles per hour near a park where children were playing when a red Jeep hit her car from behind three to four times in quick succession. A.A.'s head and neck were thrown forward each time the Jeep hit her car. A.A. pulled over to let the Jeep pass. She felt dizzy for an hour. The rear bumper of her car was scratched.

A.A. followed the Jeep and took a picture of its license plate at an intersection. She eventually lost sight of the Jeep and drove home. She told her husband about the incident, and he called 911. A.A. had difficulty talking to the 911 operator because she was upset and crying.

The second victim, M.M., was merging off Interstate 80 approaching the Pagel Pass off-ramp on her way home after work when a red Jeep came flying up and hit the rear of her car. M.M. was traveling at a speed of under 20 miles per hour while merging. The Jeep hit her car repeatedly as she tried to get out of its way. M.M. could not move

---

[1] Undesignated statutory references are to the Penal Code.

due to the close proximity of other cars. She tried to brake, but the Jeep was pushing her car. The Jeep kept hitting her, eventually pushing her into the center turning lane.

After hitting M.M. eight to 10 times, the Jeep drove around and got in front of her. M.M. followed the Jeep, and it cut off other vehicles and drove in the center lane and on the opposite side of the road in an effort to evade her. M.M. followed the Jeep into a parking lot and pulled alongside it. She asked the driver—whom she identified in court as Bogdanoff—for his insurance information. He refused to provide it. M.M. started to get out of her car, but got back in when Bogdanoff approached her aggressively. Bogdanoff told M.M. that he was going to ram her car if she did not leave him alone.

Repairs to the back of M.M.'s car cost about $20,000. M.M. suffered neck and back pain for weeks.

J.K. witnessed the incident involving M.M. He was driving past Pagel Pass when he saw a Jeep strike another vehicle three or four times. The first hit appeared to be the hardest. Pieces of plastic came off the cars. The driver in the car appeared to be trying to get away. J.K. testified that "the vehicle in the front looked like it was definitely getting hit pretty good." The woman driving had trouble maintaining control of her car after it was hit. To J.K., it looked more like a road-rage incident than an accident. He called 911 and reported a red SUV slamming into the back of another vehicle multiple times. Soon thereafter, Bogdanoff himself called 911 and reported that he was being followed.

Roseville Police Officer Samantha Summers approached the scene and saw M.M.'s sedan and Bogdanoff's red Jeep parked alongside each other, pointing in opposite directions. By the time she arrived at the location, M.M. had left. Bogdanoff identified himself as the driver of the Jeep. Summers noticed minor damage to the front of the Jeep. When Summers asked about the car following him, Bogdanoff appeared agitated. He said he had not been involved in any collision that day. He admitted he had been in the area of both collisions but denied being involved in either one.

3

Roseville Patrol Officer Nathan Bonner also arrived at the scene and spoke to Bogdanoff. Bogdanoff appeared angry and confrontational. Bogdanoff denied having been in a collision. Bonner did not believe that Bogdanoff was under the influence of any substance or that he was exhibiting any medical issues.

Based on the timing of the 911 calls, Bonner determined that the incident involving A.A. happened before the one involving M.M. Another officer investigating the two collisions concluded that they occurred five to eight minutes apart and about one and one-half to two miles away from each other.

Roseville Police Officer Daniel Timoney testified as an accident investigation expert. He opined that various outcomes may occur when one car rear-ends another. The driver of the hit car could lose control and hit another vehicle. The rear-ended car might go off the road and hit cyclists and/or pedestrians. The rear-ended car could also stop in the middle of the road and be struck by another vehicle.

Timoney further testified that the harm can be significant even when a car is rear-ended at a slow speed. The risk of injury also increases when a car is rear-ended multiple times in a short period of time. Cars are generally designed for a single crash so that seatbelts lock or airbags deploy.

Timoney also stated that a rear-end collision on the street where the incident involving A.A. occurred could endanger more people due to the higher number of pedestrians and cyclists in the area. Where the incident involving M.M. occurred, Pagel Pass, a vehicle could be pushed into the cement barriers, which do not absorb energy like a guardrail. All the energy would be transferred to the car.

Timoney additionally testified that a Jeep like Bogdanoff's model is heavier than an average sedan. The weight of the vehicle and its speed are two of the main factors in determining its kinetic energy. The greater the kinetic energy, the greater the force applied in a collision. The larger the vehicle, the greater the force applied. The force cannot be determined solely by the appearance of damage. Significant damage may

4

occur with little force and the other way around. In a hypothetical incident based on the facts of each collision in this case, Timoney testified that he would be concerned that serious injury requiring medical care could result for people in a smaller vehicle.

Bogdanoff did not testify at trial but did not object to the admission of his testimony at the preliminary hearing. At the preliminary hearing, he testified, "I didn't do the accident. I didn't do anything. That's – that's basically my whole testimony right there." He agreed that his Jeep was red. He could not remember the exact license plate number, but confirmed that the number recited by the prosecutor was correct. He said that he lived in the Roseville area and drove his car every day. He stated that he was not using drugs or alcohol at the time of the collisions. Bogdanoff recalled being pulled over in his Jeep by police and receiving paperwork informing him that his license was suspended.

The trial court found Bogdanoff guilty on all counts. It also found multiple aggravating circumstances true: the crimes involved great violence or threat of great bodily harm (Cal. Rules of Court, rule 4.421(a)(1)), Bogdanoff was armed with or used a weapon (rule 4.421(a)(2)), the victims were particularly vulnerable (rule 4.421(a)(3)), Bogdanoff engaged in violent conduct that indicates he is a serious danger to the community (rule 4.421(b)(1)), his prior convictions were numerous or of increasing seriousness (rule 4.421(b)(2)), he served a prior prison term (rule 4.421(b)(3)), he was on supervision when the crime was committed (rule 4.421(b)(4)), and his performance on supervision was unsatisfactory (rule 4.421(b)(5)).

The trial court also found true that Bogdanoff suffered three prior serious or violent felony convictions. Those convictions occurred in 2014 when Bogdanoff pleaded no contest to inflicting injury on an elderly adult (§ 368, subd. (b)), first degree burglary (§ 459), and assault with a deadly weapon (§ 245, subd. (a)(1)).

The trial court denied Bogdanoff's request to dismiss his prior strikes under both section 1385, subdivision (c) and *Romero*. It struck the prior serious felony

5

enhancements under section 1385, subdivision (c)(3). The court sentenced Bogdanoff to 25 years to life on each of the assault with a deadly weapon charges, with the sentences to run consecutively. The court also imposed sentences of six months, concurrent, on each of the two hit-and-run convictions. The aggregate sentence was 50 years to life.

Bogdanoff filed a timely appeal.

DISCUSSION

I.

Bogdanoff contends that the trial court violated his right to due process by failing to revoke his self-representation after his conduct at trial demonstrated that he was not competent to represent himself.

A.

In March 2022, soon after he was originally charged, Bogdanoff asked to represent himself. The trial court engaged in an extended colloquy with him, advising him of his rights and the disadvantages of proceeding without counsel. Bogdanoff expressed his understanding of the court's admonitions, and the court accepted his waiver of counsel.

In May 2022, the prosecutor informed the trial court that the district attorney's file on a prior criminal case indicated that doubts about Bogdanoff's competency had been raised in that case and that a competency evaluation had been performed. The court proposed to appoint a psychologist to evaluate Bogdanoff's competency to represent himself. Bogdanoff agreed to the court's proposal.

Dr. Eugene Roeder evaluated Bogdanoff on June 23, 2022, and concluded that he was competent to represent himself. Dr. Roeder's report explained that Bogdanoff has a long history of diagnosis and treatment for bipolar disorder with psychotic features, including psychiatric hospitalizations. It noted that Bogdanoff had been evaluated for competency to stand trial on numerous occasions between 2012 and 2014. On each occasion, the evaluator opined that, while Bogdanoff suffered from the symptoms of severe mental illness, he was competent to stand trial if and when he took prescribed

6

medication. Psychological testing performed in 2012 also suggested that Bogdanoff has a narcissistic personality and "grandiose and at times unrealistic perceptions and beliefs about his own abilities."

With respect to Bogdanoff's ability to represent himself, the report concluded that he was able to carry out the basic tasks needed to present a defense without help from counsel. Dr. Roeder cautioned, however, that his opinion was "tentative" and would change if Bogdanoff experienced an exacerbation of his psychiatric symptoms, which could occur even if he remained on his medication. The report further stated that if Bogdanoff continued to take his prescribed medication and the medication remained effective, a decompensation leading him to become out of touch with reality "is not necessarily imminent," but "the prognosis for this to occur at some point within the next several months is in the range between possible and probable."

On June 29, 2022, after reviewing the psychologist's report, the trial court engaged Bogdanoff in another detailed colloquy concerning his rights and the drawbacks of proceeding without counsel. Bogdanoff maintained his desire to represent himself. The court found that Bogdanoff made a knowing, intelligent, and voluntary waiver of his right to counsel and granted his request for self-representation.

Trial began two days later, on July 1, 2022, and concluded on July 8, 2022. Bogdanoff represented himself throughout trial. The trial court appointed counsel to represent him for sentencing.

B.

The Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves. (*Faretta v. California* (1975) 422 U.S. 806.) A defendant's waiver of his or her right to counsel must be knowing and voluntary. (*People v. Mickel* (2016) 2 Cal.5th 181, 205.)

In limited circumstances, a defendant's right to self-representation may give way to countervailing considerations. (*People v. Mickel, supra*, 2 Cal.5th at p. 206.) In

7

*Indiana v. Edwards* (2008) 554 U.S. 164, the United States Supreme Court held that the federal Constitution does not bar states from "insist[ing] upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id.* at p. 178.) The court described competence for self-representation as the ability "to carry out the basic tasks needed to present [one's] own defense without the help of counsel." (*Id.* at pp. 175-176.)

After *Edwards*, our state high court ruled in *People v. Johnson* (2012) 53 Cal.4th 519, 528 (*Johnson*) that California courts have the discretion to deny self-representation in those cases where *Edwards* would permit it. "Under *Edwards*, a trial court may exercise its discretion to deny self-representation where a defendant suffers from a severe mental illness such that he or she is unable to perform the basic tasks necessary to present a defense." (*People v. Mickel*, *supra*, 2 Cal.5th 181 at p. 208.)

"Trial courts must apply this standard cautiously." (*Johnson*, *supra*, 53 Cal.4th at p. 531.) "Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly." (*Ibid.*) In addition, a trial court "need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Id.* at p. 530.)

On review of a trial court's competency assessment, we "defer largely to the trial court's discretion." (*Johnson*, *supra*, 53 Cal.4th at p. 531.) A trial court's determination will be upheld if it is supported by substantial evidence. (*Ibid.*) An appellate court's deference to a trial court's judgment is "especially appropriate" when the same trial judge has observed the defendant on multiple occasions. (*Ibid.*)

C.

Bogdanoff does not challenge the trial court's initial decision to accept his *Faretta* waiver. He argues instead that the trial court violated his federal due process rights by

8

not rescinding his self-representation after his behavior at trial demonstrated that he was not mentally competent to conduct his own defense. That argument is foreclosed by controlling precedent. In *People v. Taylor* (2009) 47 Cal.4th 850, our state supreme court concluded that " '*Edwards* did not alter the principle that the federal [C]onstitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself,' " provided that he is " 'competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent.' " (*Id.* at p. 878.) Bogdanoff does not argue here that he was incompetent to stand trial or that his *Faretta* waiver was not knowing and voluntary. Accordingly, his federal constitutional rights were not violated when he was permitted to represent himself throughout the duration of his trial. (*Ibid.*; *People v. Miranda* (2015) 236 Cal.App.4th 978, 988.)

Bogdanoff also contends that the trial court abused its discretion in failing to revoke his self-representation when his behavior at trial suggested that his mental competence had deteriorated. As noted above, our state high court held in *Johnson* that California courts are permitted to exercise the discretion recognized in *Edwards* to deny self-representation when a defendant is suffering from a serious mental illness that prevents him or her from carrying out basic defense tasks. (*Johnson*, *supra*, 53 Cal.4th at pp. 528-530.) On the record before us, however, we do not perceive an abuse of discretion in the trial court's failure to sua sponte terminate Bogdanoff's self-representation.

As an initial matter, it is clear that the trial court understood that it had the authority to inquire into Bogdanoff's mental competence in deciding whether to allow him to represent himself. That distinguishes this case from *People v. Shiga* (2016) 6 Cal.App.5th 22, on which Bogdanoff places significant reliance. In *Shiga*, the trial court erroneously believed that it lacked the authority to inquire into whether the defendant was mentally incapable of representing himself. (*Shiga*, at pp. 40-42.) Here,

9

when a question about Bogdanoff's competency surfaced, the court obtained an expert evaluation, and only after reviewing it, allowed Bogdanoff to proceed to trial without counsel.

We also do not believe that the trial court was required to suspend proceedings and initiate a second competency inquiry once trial was underway. Trial started and ended within 15 days of Dr. Roeder's evaluation. During that period, no evidence emerged that Bogdanoff had stopped taking his medication. And while Dr. Roeder opined that it was between "possible and probable" that Bogdanoff's mental condition would severely deteriorate even if he remained medication-compliant, Dr. Roeder said that such decompensation was "not necessarily imminent," noting only that it could occur "at some point within the next several months."

Bogdanoff's behavior also did not indicate that he was no longer able to perform the basic tasks necessary to his defense. The record demonstrates that he remained respectful throughout trial. He asked some relevant questions and made on-point objections to the People's evidence. For example, he questioned A.A. on the extent of her injuries and damage to her car. He also challenged the prosecution's presentation of expert testimony concerning hypothetical accidents when no facts then in evidence demonstrated the relevance of the scenarios being posited.

It is true, as Bogdanoff argues, that his conduct at trial evinced a lack of legal knowledge and that he engaged in ill-advised defense tactics. For example, he misunderstood the law governing mental health diversion, failed to cross-examine most of the prosecution's witnesses, declined to deliver a closing argument, and demonstrated frustration and a lack of understanding about the procedure for proving prior convictions. But for better or for worse, a criminal defendant's unfamiliarity with legal concepts and poor performance at trial alone do not authorize a trial court to deny his or her constitutionally guaranteed right of self-representation. (See, e.g., *People v. Taylor*, *supra*, 47 Cal.4th at p. 866; *People v. Best* (2020) 49 Cal.App.5th 747, 758 [defendant's

10

lack of "knowledge of criminal law and courtroom procedure . . . is not a basis to deny the right of self-representation"].)  Nor may a court deny self-representation "merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides.  Rather, it may deny self-representation only in those situations where *Edwards* permits it." (*Johnson*, *supra*, 53 Cal.4th at p. 531.)  On the record before us, we see no convincing demonstration that, during the short period between Dr. Roeder's evaluation and the end of trial, Bogdanoff's condition deteriorated to the point that he was unable to conduct his defense.  There was thus no abuse of discretion when the trial court failed to terminate Bogdanoff's self-representation.

## II.

Bogdanoff next contends there was insufficient evidence to support his conviction of assault with a deadly weapon as to victim A.A.  In particular, he asserts that his Jeep does not qualify as a deadly weapon with respect to A.A. because it struck her car at a low speed and caused only minimal damage.  We find sufficient evidence supports his conviction on this count.

## A.

Section 245, subdivision (a)(1) provides that "[a]ny person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."  A " 'deadly weapon' " under this provision is " ' "any object, instrument, or weapon [that] is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' " (*People v. Perez* (2018) 4 Cal.5th 1055, 1065.)  A few objects, such as dirks and blackjacks, are deadly weapons as a matter of law because " 'the ordinary use for which they are designed establishes their character as such.' " (*Ibid.*)  " 'Other objects,

11

while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury.' " (*Ibid.*)

In evaluating whether an object that is not inherently deadly or dangerous is used in a manner likely to cause death or great bodily injury, the trier of fact may consider " 'the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' " (*In re B.M.* (2018) 6 Cal.5th 528, 533.) "[F]or an object to qualify as a deadly weapon based on how it was used, the defendant must have used the object in a manner not only capable of producing but also *likely to produce* death or great bodily injury." (*Id.* at p. 530.) "The use of an object in a manner 'likely to produce' death or great bodily injury [citation] requires more than a mere possibility that serious injury could have resulted from the way the object was used." (*Id.* at p. 534.)

"In deciding claims of insufficient evidence, we review the entire record in the light most favorable to the prosecution 'to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186.) We do not resolve credibility issues or evidentiary conflicts; we presume every fact supporting the judgment that the trier of fact could deduce from the evidence. (*Ibid.*) Reversal for insufficient evidence is not warranted unless there is no hypothesis that would support the decision. (*Ibid.*)

B.

Construed in the light most favorable to the judgment, the record supports Bogdanoff's conviction. At trial, the prosecution presented evidence that Bogdanoff came "out of no where [*sic*]" and hit A.A.'s car "[p]retty hard." He drove his Jeep into A.A.'s back bumper three or four times. A.A. lurched forward into the seat belt; her head and neck were thrown forward each time Bogdanoff hit her. A.A. was dizzy for an hour because of the "backlash movement." We conclude this is sufficient evidence to support

12

the conclusion that Bogdanoff's use of his vehicle was likely to produce great bodily injury.

Bogdanoff emphasizes that A.A. suffered only minor injuries and that the damage to the two cars was minimal. He is correct that "the extent of actual injury or lack of injury" is a relevant consideration. (*In re B.M.*, *supra*, 6 Cal.5th at p. 535.) But on this record, the fact that A.A. did not suffer more extensive injuries does not establish that "the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Ibid.*) While A.A. was not, for example, hospitalized after the incident, her car was hit with sufficient force that she was thrown forward each time Bogdanoff's Jeep struck her car, causing a whiplash effect to her neck. The "evidence may show that serious injury was likely, even if it did not come to pass." (*Ibid.*)

Bogdanoff notes as well that he was driving at a slow speed, but the accident investigation expert testified that the weight of a vehicle is as much a factor in the amount of force generated in a collision as the speed. Bogdanoff's argument also overlooks that he rammed A.A.'s car three or four times, which itself increased the risk of injury.

Finally, we are unpersuaded by Bogdanoff's effort to contrast this case with those in which courts found sufficient evidence that a vehicle was used in a way likely to produce great bodily injury. (See, e.g., *People v. Golde* (2008) 163 Cal.App.4th 101, 107, 116 [defendant attempted to run over a pedestrian]; *People v. Aznavoleh*, *supra*, 210 Cal.App.4th at pp. 1183-1184 [street racing at 60 miles per hour]). Section 245, subdivision (a)(1) is not limited to only facts like these.

### III.

Bogdanoff additionally argues that the trial court should have dismissed his prior strike convictions under section 1385, subdivision (c). We reject that contention.

Section 1385, subdivision (c)(1) provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if

13

dismissal of that enhancement is prohibited by any initiative statute." This court recently held in *People v. Burke* (2023) 89 Cal.App.5th 237 that section 1385, subdivision (c) does not apply to prior strikes. *Burke* explained that section 1385, subdivision (c) "expressly applies to the dismissal of an 'enhancement,' " and "the Three Strikes law is not an enhancement." (*Burke*, at pp. 243-244.) Rather, it "is an alternative sentencing scheme for the current offense." (*Id.* at p. 243.)

Bogdanoff acknowledges *Burke* but argues that it misinterpreted the statute. We have reviewed his arguments based on the statutory text, legislative history, and canons of construction, but none persuades us that *Burke* reached the wrong conclusion. Moreover, since *Burke* was decided, other appellate opinions have agreed that section 1385, subdivision (c) does not apply to the Three Strikes law. (*People v. Olay* (2023) 98 Cal.App.5th 60, 69; *People v. Dain* (2024) 99 Cal.App.5th 399, 410-411, review granted May 29, 2024, S283924.) Consistent with the holdings in these decisions, we see no error in the trial court's decision not to apply section 1385, subdivision (c) to Bogdanoff's prior strikes.

IV.

We also conclude that the trial court acted within its discretion in declining to dismiss Bogdanoff's prior strikes under *Romero* and section 1385, subdivision (a).

A.

After his conviction, Bogdanoff filed a motion under *Romero* asking the trial court to exercise its discretion to treat his three prior strikes as one and dismiss two of them. The court rejected the request.

The trial court examined the facts of the offenses as well as Bogdanoff's prior convictions and background. With respect to the current offenses, the court reasoned that Bogdanoff's acts were dangerous, endangered pedestrians and other drivers, and caused significant trauma to the victims.

14

With respect to the prior convictions, Bogdanoff was driving behind an elderly man whom he thought was going too slow. Bogdanoff followed the man home, entered his garage, and beat him. Bogdanoff then attacked a neighbor who tried to help. When Bogdanoff drove off, people had to jump out of the way to avoid being hit. The elderly victim suffered traumatic brain injury and lifelong speech impairment.

The trial court did not find these prior strike convictions from 2014 "remote in the least." Bogdanoff received a nine-year sentence and was on parole at the time of the current offenses. Describing his criminal history overall, the court observed that Bogdanoff's "level of violence is significant. It is not decreasing by any measure and has not abated and is continuing."

The trial court also considered aggravating and mitigating circumstances. The court observed that it had found numerous aggravating circumstances true. It explained: "Balancing that out with any mitigation which may perhaps be the fact that there are some mental health issues that Mr. Bogdanoff has, I've considered that, but clearly in this [c]ourt's view, the factors in aggravation outweigh the factors in mitigation." The court further noted Bogdanoff's age, the childhood abuse he suffered, and his bipolar disorder. It said "those mental health issues not necessarily are mitigating," because "[t]hey show a person who has some narcissistic qualities" and "no ability to self-reflect and understand his behavior or the wrongness of it."

The trial court also expressed doubt about Bogdanoff's ability to comply with supervision. Bogdanoff committed the current offenses when on parole, and his history demonstrated that he was unable to control his anger. Considering all these circumstances as well as the length of the proposed sentence, the trial court declined to strike any of Bogdanoff's prior strike convictions.

B.

Section 1385, subdivision (a) authorizes trial courts to dismiss prior strikes "in furtherance of justice." (§ 1385, subd. (a); *People v. Williams* (1998) 17 Cal.4th 148,

15

161.) In *Romero,* our state supreme court held that a trial court may strike a prior conviction under the Three Strikes law under this provision. (*Williams*, at p. 158.) In ruling on a *Romero* motion, the court considers "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.)

A trial court's decision not to strike a prior conviction is reviewed under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) A court abuses its discretion when it is not aware of its discretion to dismiss, considers impermissible factors, or where the sentencing norm under the Three Strikes law leads, as a matter of law, to a result that is arbitrary, capricious, or patently absurd, given the circumstances of the individual case. (*Id.* at p. 378.) It is not enough to show that reasonable people might disagree. (*Ibid.*) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

We are unable to conclude that the trial court abused its discretion in declining to strike Bogdanoff's prior strike convictions. Bogdanoff emphasizes his mental illness and the great length of his sentence. We agree these are relevant factors weighing in favor of striking his prior convictions. (*People v. Williams*, *supra*, 17 Cal.4th at p. 161 [defendant's background is a factor]; *People v. Garcia* (1999) 20 Cal.4th 490, 500 [defendant's sentence is "a relevant consideration"].) But on the record before us, we cannot say that the trial court acted arbitrarily or irrationally when it declined to take that step. As the trial court reasoned, Bogdanoff's criminal history is extensive and includes crimes of serious violence. His current offenses risked significant harm to not only the direct victims whose cars he struck but also other motorists and pedestrians in the area.

16

Bogdanoff was on parole for another road-rage-inspired crime when he committed the current offenses. Under these circumstances, the trial court acted within its discretion in concluding that Bogdanoff's commitment offenses, criminal history, and personal background did not take him outside the spirit of the Three Strikes law.

DISPOSITION

The judgment is affirmed.


　　　　　　　　　　　　　　　　/s/               
　　　　　　　　　　　　　　　　FEINBERG, J.


We concur:


/s/               
HULL, Acting P. J.


/s/               
RENNER, J.